# CLEMENT *v.* PACKER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 143. Argued January 23, 24, 1888. — Decided March 19, 1888.

An assignment, as error, that the court below rejected certain patents of land offered in evidence by the plaintiff is fatally defective, if the record does not contain copies of the patents.

In an action of ejectment in a Circuit Court of the United States, sitting in the State of Pennsylvania, which involves a question concerning the location of the boundary of a private estate, that rule of evidence respecting the admission of declarations of deceased persons touching the disputed boundary which is laid down by the highest court of that State is the rule to govern the action of the Circuit Court at the trial; and it is well settled in that State that declarations of a deceased person touching the locality of a boundary which was surveyed and located by him, which declarations were made to the witness in pointing out that locality, are admissible in evidence.

*Hunnicutt* v. *Peyton*, 102 U. S. 333; and *Ellicott* v. *Pearl*, 10 Pet. 412, distinguished.

In Pennsylvania, original marks and living monuments are the highest proof of the location of a survey; the calls for adjoining surveys are the next most important evidence of it; and it is only in the absence of both that corners and distances returned by the surveyor to the land office determine it.

Surveys constituting a block are not treated in Pennsylvania as separate and individual surveys, but are to be located together as a block on one large tract; and if the lines and corners of the block can be found, this fixes its location, as they belong to each and every tract of the block as much as they do to the particular tract which they adjoin.

When the location of a survey in Pennsylvania can be determined by its own marks upon the ground, or by its own calls, courses, and distances, it cannot be changed or controlled by the marks or lines of an adjoining junior survey; but when, by reason of the disappearance of these

original landmarks from the senior survey, the location of a line or the identity of a corner is uncertain and is drawn in controversy, then original and well established marks found upon a later survey, made by the same surveyor about the same time, and adjoining the one in dispute, are admissible — not to contest or control the matter — but to elucidate it and thus aid the jury in discovering the location of the senior survey.

After the lapse of twenty-one years from the return of a survey in Pennsylvania, the presumption is that the warrant was located as returned by the surveyor to the land office, and in the absence of rebutting facts, the official courses and distances determine the location of the tract; but this presumption is not conclusive, and may be rebutted by proof of the existence of marked lines and monuments, and other facts tending to show that the actual location on the ground was different from the official courses and distances.

THE court stated the case as follows:

The plaintiff below, Packer, brought an action of ejectment to recover from the defendant below, Clement, one hundred and twenty acres of land located in Mount Carmel Township, Northumberland County, Pennsylvania. He claimed this 120 acres as part of a tract of land surveyed in October, 1794, under a warrant dated 26th of November, 1793, issued in the name of William Elliott, the title to which was in him, the plaintiff. On the trial he adduced evidence, showing that this William Elliott tract was one of six tracts of a block of surveys — a term which, under the Pennsylvania land system, means a series of surveys made by one surveyor at the same time upon warrants issued upon the same day, owned by the same person, dependent upon each other in succession, calling for each other, and returned to the land office at the same time, and so located on the ground that the tracts each adjoin the other side by side as a body. In that State the warrant and survey thereon and the return of the survey constituted the legal mode of acquiring lands from the Commonwealth. The block just mentioned was known as the Le Fevre block, and the tracts composing it were designated by the names of the persons to whom they were warranted, as follows: The Ebenezer Branham, Nathaniel Brown, Lewis Walker, William Shannon, William Elliott, and the Joseph Tyson, all of which

were dated November 26, 1793, surveyed on the 21st and 22d days of October, 1794, and returned into the land office by William Gray, deputy surveyor, February 23, 1795.

The plaintiff claimed that the northern boundary of this tract was identical with the southern line of the defendant's tracts, and that such southern boundary was about 60 rods further north than that claimed by the defendant, and down to which he was in actual possession. The question in the case, as exhibited by the record, is one of location, the burden of proof being on the plaintiff below to show the location of the northern boundary of the William Elliott tract, and that the 120 acres in dispute are within the limits of that tract.

The plaintiff below produced evidence showing that the tracts claimed and possessed by the defendant lying directly north of the William Elliott tract were known as the Mary Myers and Charlotte Ruston tracts, and were two of a block of eleven tracts, surveyed under warrants, all dated June 11, 1793, granted in the name of Daniel Reese, Charlotte Ruston, Mary Myers, John Reynolds, Thomas Billington, Mary Ruston, Thomas Ruston, Mary Ruston Jr., John Young, Joshua Bean, and Samuel Lobdil, surveyed on the 2d and 3d of October, 1793, and returned to the land office by William Gray, deputy surveyor, as one block, on the 3d of March, 1794; and that these eleven tracts of land (which were known as the Brush Valley block) extended along the Le Fevre block on the north, and were specially named in the official returns of the surveys of the latter as adjoining on the north.

He contended that the northern line of the William Elliott tract was identical with the southern line of the Charlotte Ruston and Mary Myers tracts; that his right, therefore, extended as far north as the southern line described in the official returns of those tracts; and that the true mode of ascertaining such southern line was to run out the lines of said tracts according to courses, distances, and calls, in the official returns of the original surveys. He showed by the returns and by the evidence of surveyors that the southern line thus located by official courses, distances, and calls would leave the land in dispute outside of the defendant's tracts, and therefore

No. 3.

MAP OF

BRUSH VALLEY AND LE FEVRE BLOCKS

IN CONNECTION WITH THE

RICHARD MARTIN AND FRANCIS WEST

within the limits of the 'William Elliott tract belonging to the plaintiff below. He produced A. B. Cochran, a surveyor, who in the winter of 1881 and the spring of 1882 had made an examination of the Brush Valley land in connection with that of the Le Fevre block.

This witness testified that he found the northern boundary of the Brush Valley block well defined by marks still existing on the ground made at the time of the original survey in 1793, and many of the living corners (trees) standing in the places designated in the official return; and that the lines of the different tracts corresponded pretty nearly with the official courses and distances, "sometimes a little bit long, and sometimes a little bit short," in one instance as many as 18 rods difference. He stated, very positively, that along the entire southern side of the block there were no marks upon the ground; no living corners, except one hereafter noted; no indication of any work, whatever, by the deputy surveyor in 1793; and that the official returns of the survey called only for posts for corners, with the exception just mentioned, which fact he stated was regarded by surveyors as evidence that the line had never been actually located on the ground, but simply protracted on paper. He stated further that there were no division lines actually run between any of the tracts of this Brush Valley block, except one, and that line was between the John Reynolds and the Thomas Billington tracts, which he stated was well marked upon the ground to a stone heap, which very nearly corresponded by course and distance with the corner called for in the official return of the surveys of these two tracts, and designated therein as a small maple tree, at the southeast corner of the Reynolds tract, and the southwest corner of the Billington tract. This stone heap had been made as a mark in 1847, and located as the maple corner thus called for, by David Rockefeller, a surveyor, since deceased.

The deposition of David Rockefeller, taken on a former trial, was then read in evidence to show the location of this small maple tree called for as the common corner of the Reynolds and Billington tracts, (southeast of the one and southwest of the other,) in which Rockefeller testifies that in surveying

these lands in 1847 he found the line between these two tracts (the Reynolds and the Billington) well defined upon the ground by marks made at the time of the original survey in 1793, and that he found in running from the northern corner, according to the official courses, at the end of the official distance, a small maple stump and maple sprouts growing around it, and a small maple tree lying on the ground, the trunk of which was burned entirely away for 6 or 7 feet, so that no surveyor's mark could be found upon it. The testimony of Cochran and others was to the same effect, and they all gave it as their opinion that this was the true location of the maple tree called for as the common corner of the Reynolds and Billington tracts.

He also showed, by the testimony of these and other witnesses, that if this maple stump was the true location of the maple tree called for as the southeast corner of the Reynolds and the southwest of the Billington, it would establish the southern line of the whole Brush Valley block; and by running it east and west from that point, according to the courses and distances, the land in controversy would be outside of the Mary Myers and Charlotte Ruston tracts owned by the defendant below, and within the limits of the Elliott tract belonging to the plaintiff below.

The plaintiff below further contended that in case the maple stump, which he claimed to have proved to be the maple tree called for in the official return, was not proved to be such corner, then the whole southern boundary was protracted on paper without any actual survey being done upon the ground; and in the absence of any marks whereby such southern boundary could be definitely fixed, the true mode of ascertaining its location, as determined by the deputy surveyor in 1793, was to start from the well-marked boundary on the north, and run out the lines according to the official courses and distances.

In reply, the defendant contended that the true mode of ascertaining the lines of a survey was to run them according to the marks and monuments on the ground made by the surveyor at the time of the survey, along with the lines and distances of the official return, when these latter corresponded

with such marks and monuments upon the ground; but in case of a conflict or variance, the original marks and monuments were to prevail and determine the location of the survey.

He denied that the southern line of the Brush Valley block had been platted on paper, and alleged, on the contrary, that it was run at the time of the original survey, and marked upon the ground far enough south of the line contended for by the plaintiff to include the 120 acres in dispute within the limits of the Charlotte Ruston and Mary Myers tracts. He introduced M. B. Trescott, and several other surveyors, who testified that the point located by Rockefeller, as the maple tree corner called for at the end of the Reynolds and Billington dividing line, was several perches north of the official distance, and several perches outside of the official courses. He had read from the deposition of Rockefeller, already offered by the plaintiff, the statement that he, Rockefeller, had been county surveyor of Northumberland County for 16 or 18 years, and that he knew from the official papers in his hands, during that period, that one Henry Donnel was at the time these surveys were made a regular deputy surveyor of William Gray, and that his (Donnel's) district embraced all this side of the river, including the Shamokin and Mount Carmel coal regions, where the surveys are that are involved in this controversy.

To show the true location of the maple at the common corner of the Reynolds and Billington tracts to be 60 rods south of where Rockefeller had claimed to locate it, he offered in evidence the deposition of John Fisher, deceased, taken in several cases pending in the Common Pleas Court of Northumberland County, between the plaintiff in error and the Northumberland Coal Company in 1878, it having been admitted that John Fisher was dead. This deposition was offered to prove by John Fisher that in 1815 Henry Donnel was surveying the Brush Valley lines, and he, Fisher, was with him as chain-carrier. That when they were running the line between the Billington and Reynolds tracts, and were at a point about 60 rods south of the stump located by Rockefeller at a swamp, they found a stone corner — "stones piled up." Donnel said: "This is the corner; here is where we located these warrants 21 or 22 years ago."

The plaintiff below objected to the admission of these declarations of Henry Donnell. The court sustained the objections and rejected those portions of the deposition embraced in brackets, and sealed the bill of exceptions at the instance of the defendant.

The portions rejected are as follows: Donnel said: [" While there at the corner, 21 or 22 years ago, we located these warrants." When we got to the corner, Mr. Donnel said: " Here is the corner," pointing to it.] [All Donnel said was: " This is the corner; here is where we located these warrants 21 or 22 years ago." This was when we were running the line between the Billington and Reynolds. Donnel said it was the line. I knew it was the line.] And again: [At the time Henry Donnel said he located these warrants, 21 or 22 years ago, he was surveying the Brush Valley lands — I mean the Ira Clement lands.]

The defendant also introduced several surveyors who testified to the fact of original marks east of and in a direct line with the point at which he claimed the maple stood, and also to two other line trees bearing the marks of the survey of 1793, showing that the southern boundary of the Brush Valley lands is from thirty to sixty rods below that contended for by the plaintiff below.

In confirmation of this being the true location of the line in question, the defendant below showed from the evidence elicited on cross-examination of a witness for the plaintiff, and also by numerous surveyors who appeared as witnesses for the defendant, that the Ebenezer Branham (which was the extreme eastern and controlling warrant of the Le Fevre block) had still existing on its northern boundary authentic and original marks and monuments made at the time of the survey, and answering to the official calls thereof; nearly all of whom testified that these marks thus defining the northern boundary of the Ebenezer Branham tract were sufficient to establish the entire northern boundary of the Le Fevre block, which northern boundary, they stated, would be identical with the southern line of the Brush Valley block, located as claimed by the defendant.

To give additional support to his theory of constructing the dividing line in question he put in evidence the location of two surveys outside of the Brush Valley block, made by the same surveyor about the same time, whose established lines and corners he proposed to show were in perfect harmony with the location of the Brush Valley block contended for by the defence. It appeared in evidence that the first of these surveys was warranted to one Francis West, surveyed on the 10th day of September, 1793, located east and within a mile of the Brush Valley block, and that its lines, boundaries, corners, and calls were established by original undisputed monuments on the ground. It was also proved that the other tract was warranted to one Richard Martin, and surveyed on the 23d day of February, 1794, and called to adjoin the Francis West on the east and the Samuel Lobdil on the west; this last being the extreme eastern tract of the Brush Valley block. It also appeared in evidence that the eastern line of the Lobdil and the western of the Martin were reported by the return to be of the same length.

The surveyors, hereinbefore referred to as witnesses for the plaintiff, state that the Francis West and the Richard Martin have a common corner the southwest of the former, and southeast of the latter; that this corner is also called for as a mark on the northern line of the Ebenezer Branham, as above noted; that, starting from this recognized corner, called for by the three surveys, (the Francis West, the Richard Martin, and the Ebenezer Branham,) and following the southern line of the Richard Martin, (which is also the northern line of the Ebenezer Branham tract, and which all the surveyors, on both sides, testify is marked by monuments counting back to 1793, for a distance of 150 perches,) in its official courses and distances, it intersects the common line between the Lobdil and Martin tracts extended 32 perches south of its official length; that at this point of intersection there is a well-established corner common to the Martin and Lobdil tracts; that, if the southern line of the Brush Valley block was run, starting from this southeast corner of the Lobdil tract, according to the official courses and distances, it would be carried actually

upon the line claimed by the defendant below, indicated by the marked line trees and monuments, and strike the point at which he claimed the maple corner was located in the edge of the swamp; and therefore would place the land in controversy without the Elliott tract, and within the Charlotte Ruston and Mary Myers surveys.

He also introduced evidence to show that the eleven surveys of the Brush Valley block and the Richard Martin survey were all in the hands of the deputy surveyor at the same time, and that the deputy returned the Richard Martin into the land office before the return of the Brush Valley lands, stating that its western line was 320 rods in length; and three days after returned the Samuel Lobdil, giving it the same course and length of line.

These witnesses expressed the opinion, from their experience as surveyors, that the northern line of the Richard Martin was run on the ground at the same time as the Brush Valley block of surveys; that the dividing line between the Brush Valley block and the Le Fevre block of surveys should be located from the work done by the same deputy surveyor on the adjoining surveys; and that these monuments pointed out the line run by the deputy surveyor in 1793. The defendant below therefore contended that what the surveyor did, in locating the Richard Martin and the Francis West surveys, should be considered with all the other evidence in the case, in determining the question whether the southern line of the Brush Valley block was actually run upon the ground or not, and, if so, where it was run.

The plaintiff below offered rebutting testimony tending to show that the trees relied on by the defendant below, as line trees and original monuments of the survey in 1793, bore no such marks, and that no such monuments for the southern boundary of the Brush Valley block could be found, or ever existed on the ground. He contended also that the Martin, being a junior survey to that of the Brush Valley block, could not be used for the purpose of locating the southern line of the latter.

Numerous exceptions were taken during the trial, and

exceptions were also taken to the charge of the court. The jury returned a verdict for the plaintiff below, upon which judgment was rendered. The defendant below then sued out this writ of error.

*Mr. S. P. Wolverton* and *Mr. Franklin B. Gowen* for plaintiff in error.

*Mr. James Ryon* and *Mr. John W. Ryon* for defendant in error.

MR. JUSTICE LAMAR, after stating the facts in the foregoing language, delivered the opinion of the court.

The first assignment of error is to the effect that the court below erred in rejecting the offer of the plaintiff in error of six patents issued by the Commonwealth to Peter Graul for the Joseph Tyson, William Elliott, Lewis Walker, William Shannon, Nathaniel Brown, and Ebenezer Branham surveys, bearing date the 12th, 13th and 17th of April, 1797, respectively, for the purpose of locating, and showing that the Commonwealth confirmed the location of said surveys as a block, by granting patents to each one of them, and for the purpose of showing how much land the Commonwealth granted in pursuance of these several surveys.

Objection by plaintiff below to this was sustained, and exception taken. The plaintiff in error, however, has not embodied copies of these patents in the record returned. The court is therefore left uninformed as to the contents of the patents, or as to their materiality. What effect might have been given to this assignment of errors, had evidence of the contents of the patents mentioned been sent up with the record, we need not consider in disposing of this case. It is sufficient to say that this assignment of error is fatally defective for the reason given above, and it cannot be sustained.

The second specification relates to the rejection by the court of a portion of the deposition of John Fisher, referred to in the above statement. We gather from the brief of counsel

that the ground on which these declarations were ruled out was, that they were not within any of the exceptions to the general rule, that hearsay evidence is inadmissible to establish any specific fact which in its nature is capable of being proved by the testimony of a person who speaks from his own knowledge.

In *Mima Queen* v. *Hepburn*, 7 Cranch, 290, 296, Chief Justice Marshall says: "To this rule there are some exceptions which are said to be as old as the rule itself. These are cases of pedigree, of prescription, of custom, and in some cases of boundary. . . . Also matters of general and public history."

Upon the subject of boundary there is a general agreement that, by the English rule, evidence of the declarations of deceased persons as to the boundary of parishes, manors, and the like, which are of public interest, is admissible, but that such evidence is inadmissible for the purpose of proving the boundary of a private estate, unless such boundary is identical with another of public interest. In many of the States this strict rule has been extended, and these declarations have been admitted to prove the boundaries of lands of private persons. This extension of the rule has, we think, been sustained by the weight of authority in the American state courts, as justified upon grounds as strong as those on which the original rule rests.

Mr. Justice McLean states one of these grounds. In *Boardman* v. *Lessees of Reed*, 6 Pet. 328, 341, he says: "That boundaries may be proved by hearsay testimony is a rule well settled; and the necessity or propriety of which is not now questioned. Some difference of opinion may exist as to the application of this rule, but there can be none as to its legal force. Landmarks are frequently formed of perishable materials. . . . By the improvement of the country, and from other causes, they are often destroyed. It is therefore important, in many cases, that hearsay or reputation should be received to establish ancient boundaries." This was a case of private boundaries purely, and the declarations were rejected, not upon the ground of hearsay, but because they were con-

sidered as immaterial, and not tending to elucidate any ques-
tion before the jury.

The limitations upon this extension of the original rule are
different in different States. We do not deem it necessary, in
the present case, to lay down any definite rule applicable to
all cases, as to when declarations of deceased persons consti-
tute valid evidence to establish private boundaries.

The question is one involving the ownership of real prop-
erty in Pennsylvania, and it becomes our duty to ascertain the
rule established in that State, especially as respects the admis-
sibility of the declarations of deceased surveyors in cases of
boundaries between private estates.

In the case of *Caufman* v. *Presbyterian Congregation of
Cedar Spring*, 6 Binney, 59, the plaintiff claimed a certain
number of acres which were surveyed by one Wilson, an assist-
ant of the deputy surveyor, since deceased. The deputy sur-
veyor returned to the land office a smaller quantity than was
contained in Wilson's actual survey. On the trial of the case
evidence of what was said by Wilson was objected to by the
defendant upon the ground that the official return of the sur-
vey was the best evidence of the survey. The evidence was
held by the Supreme Court of Pennsylvania to have been rightly
received. Chief Justice Tilghman said: "It will be recollected
that Wilson is dead; otherwise nothing less than his own oath
could have been received. Where boundary is the subject,
what has been *said* by a deceased person is received as evi-
dence. It forms an exception to the general rule. It was
necessary for the plaintiffs to show their possession of the
lands. . . . It was impossible for the plaintiffs to show
the extent of their possession, without showing the lines run
by Wilson. Those lines were the plaintiffs' boundaries; at
least such was their claim. It appears to me, therefore, that
what was said by Wilson came within the exception which
admits the words of a deceased person to be given in evidence
in a matter of boundary." pp. 62, 63.

In *Kennedy* v. *Lubold*, 88 Penn. St. 246, the declarations of
a deceased surveyor, made thirty-five years before the trial,
were allowed to go to the jury, but the court below, in charg-

ing the jury as to the nature and force of this evidence, used the following language: "There is evidence of what Herrington or some surveyor said when he went to this tract corner. That is hearsay evidence, and we admitted that with a good deal of reluctance. We hardly believe it is evidence. We say to you in determining that evidence, it is weak evidence. It is not as strong evidence as that of witnesses who come here upon the witness stand and submit to cross-examination in testifying to what is the true corner from the very necessity of the case." The case being carried up by a writ of error to the Supreme Court of Pennsylvania, Chief Justice Agnew delivered the opinion of the court, and said: "These two cases were argued together. They seem to have been tried upon the doctrine of leaving first principles, and going on to perfection. But old surveys are not to be so tested. Most perfect in the beginning, they are constantly undergoing change and decay, until by wind, fire, rottenness, and the acts and frauds of men, their evidences lie only in memory and hearsay. Hence when the learned judge said of the acts of the surveyors, who forty years before went upon the ground, ran the lines, blocked the trees, counted the growths, found original marks, and pronounced the hickory the numbered corner of donation lot No. 1260, it was mere hearsay, he hardly believed it evidence, admitted it with reluctance, and it was weak evidence in determining, he clearly misled the jury. The reverse is true — the evidence was strong, and ought to prevail unless clearly rebutted, by showing either a mistake of the witness relating the facts, or error in the surveyors making the declaration. . . . The declarations as to the corners when found, blocked, and counted were a part of the *res gesta*, and so far from being doubtful evidence were competent and always admitted when the transaction is old and the surveyor dead." p. 255.

In *Kramer* v. *Goodlander*, 98 Penn. St. 366, the witness having testified that he had owned the land in dispute thirty years before the trial, and employed one Ferguson, a surveyor since dead, to trace the lines, it was offered to prove what Goodlander said as to the lines whilst he was on the ground

searching for them. This was rejected as purely hearsay. Justice Trunkey, delivering the opinion of the court, said: "From an early day in this State, in litigations respecting boundaries, it has been competent to prove, after the death of a surveyor who had examined a line, what, he said respecting it at the time and on the ground. . . . The offer should have been admitted."

In *McCausland* v. *Fleming*, 63 Penn. St. 36, 38, Justice Agnew, delivering the opinion of the court, said: "Pedigree and boundary are the excepted cases, wherein reputation and hearsay of *deceased* persons are received as evidence. The statements of deceased persons relative to boundaries of which they spoke from actual personal knowledge have been frequently received as evidence in this State."

There is one case in which the principles of this rule of hearsay evidence in respect to boundaries were fully considered in the Circuit Court of the United States. *Conn* v. *Penn*, 1 Peters C. C. 496. The opinion of the court was delivered by Mr. Justice Washington, and the substance of it is as follows (p. 511): The courses and distances laid down in a survey, especially if it be ancient, are never, in practice, considered as conclusive, but are liable to be materially changed by oral proof, or other evidence, tending to prove that the documentary lines are those not actually run. Reputed boundaries are often proved by the testimony of aged witnesses, and the hearsay evidence of such witnesses has been admitted to establish such lines, in opposition to the calls of an ancient patent. It is not the lines reported, but the lines which have been actually run by the surveyor, which vests in a patentee a title to the area included within those lines.

These decisions clearly require the admission of the testimony rejected by the court below, and the decisions cited by the counsel for defendant in error also seem to us in harmony with the tenor and effect of them.

The case of *Bender* v. *Pitzer*, 27 Penn. St. 333, 335, is an interesting case in its examination of the qualifications and some of the aspects of this rule. The declarations of a deceased surveyor who had not made the original survey, nor

subsequently examined it, nor run the lines upon the ground, and who was not an adjoining owner, and did not point out the lines at the time of those declarations, were held to be rightfully rejected. But Justice Knox, while rejecting the evidence, took especial care to reiterate the principles laid down in the cases heretofore cited. In delivering the opinion of the court he said: " It has long since been settled, both in this country and in England, that ancient boundaries are provable by general reputation, in a question involving public rights. In Pennsylvania a still greater latitude has been allowed in questions of boundary. Here the declarations of a deceased person touching the locality of boundary between adjoining owners have been admitted where the survey was made by the person making the declaration, or where the declaration was made by an adjoining owner, who pointed out the boundary line between the tracts to the witness at the time the declarations were made." *Caufman* v. *Congregation of Cedar Spring*, 6 Binney, 59 ; *Hamilton* v. *Menor*, 2 S. & R. 70.

To sustain the rejection of the evidence much reliance is placed on the decisions of this court in the cases of *Hunnicutt* v. *Peyton*, 102 U. S. 333, and *Ellicott* v. *Pearl*, 10 Pet. 412. But as the question is one of Pennsylvania law, to be controlled by Pennsylvania decisions, the observations of the court, in the cases cited, are not pertinent.

The first of these cases states the English rule, and summarizes some of the results to be deduced from the decisions of the state tribunals. The court concedes that, had the Supreme Court of Texas decided differently, it would have felt constrained to apply the Texas rule to the case in question ; but even under the summary of the general law in this country, as it was conceived to exist on the subject at that time, the evidence rejected in the present case ought to have been received. It is not necessary for us to approve or disapprove the departures from the original rule, because the court held that the evidence there offered was not admissible under any well-established exceptions to the rule. The court is particular to say the declarations of Moore were made, not when

he was pointing out the boundaries of the Basquez survey, but when he was at a distance from the place of beginning of that survey and from its upper line. That Moore had made the survey, or had ever been upon its upper line, or on the upper line of the reserve, was proved only by his assertion, which the court allowed to be given in evidence. There was no such proof *aliunde.*

The case of *Ellicott* v. *Pearl, supra,* was brought to this court by a writ of error in the Circuit Court of the United States for the District of Kentucky. And, in the decision here, this court adhered to the English rule, and rejected the evidence of the declaration of a deceased surveyor, as to the boundary of a private estate. In so doing, this court was simply enforcing the rule as it existed in Kentucky at that time. In *Cherry* v. *Boyd,* Litt. Sel. Cases, 8, decided by the Supreme Court of that State in 1800, it was held that evidence of the parol declarations of a surveyor concerning the marks or lines of a private estate were inadmissible. This being the settled law of Kentucky, this court could not have decided otherwise than it did in *Ellicott* v. *Pearl.* But even in that case the court uses the following guarded language: " The doctrine in America, in respect to boundaries, has gone further, and has admitted of general reputation as to boundaries between contiguous private estates."

The remaining assignments of error relate to the answers to the requests by the counsel of the respective parties for instructions to the jury, and to the general charge of the court below. They are so many in number that it would greatly protract this opinion to review them *seriatim,* and in the order of their presentation.

At the request of the plaintiff, the court below said to the jury, " that in the absence of marks on the north made for the William Elliott in 1794, by the deputy surveyor, the William Elliott must go to its calls for adjoiners on the north; that as there is no evidence of any such original marks, the William Elliott must go to its northern calls for the Daniel Reese, Mary Myers, Charlotte Ruston, and John Reynolds, and, therefore, the William Elliott will embrace the land in dis-

pute by locating the Mary Myers and Charlotte Ruston, according to the official courses and distances from their northern line, or from the Rockefeller maple corner."

We think the learned judge in giving this charge fell into error.  If it was not a positive and imperative direction to the jury to find for the plaintiff, it would be difficult to convince them that this was not the manifest intention of the court. In its logical effect it is a syllogism ; the conclusion of which is, that the land in dispute is within the limits of the William Elliott, and belongs, therefore, to the plaintiff.  Its terms are, *first,* that in the absence of any original marks on the north of the William Elliott, made by the surveyor, at the date of the survey, the William Elliott will go to its northern adjoining tracts, to wit, the Mary Myers and Charlotte Ruston ; *second,* that there is no evidence of any such original marks on the north of the William Elliott ; *third,* that, therefore, the William Elliott must go to its adjoining tracts on the north, (the Myers and Ruston,) and thus embrace the land in dispute.   The direct tendency, if not the avowed purpose, of the statements contained in this charge, is to withdraw from the consideration of the jury a very considerable amount of pertinent and important testimony for the defence.   It should be borne in mind that the William Elliott is not a single separate tract, but one of a block of several tracts, surveyed at the same time, by the same surveyor, under warrants of the same date, and for the same owner, and returned into the land office as one body.

By the settled law of Pennsylvania, applicable to the location of surveys, original marks and living monuments on the ground constitute the survey, and they are the highest proof of its true location.   The next most important evidence of location is the calls for adjoining surveys; and in the absence of both of them, and then only, the lines according to courses and distances, returned by the surveyor into the land office, determine the location.   But it is equally well settled, by an unbroken current of decisions in that State, that the surveys constituting a block are not to be treated as separate and individual surveys ; nor can each tract be located independently

of the rest, by its own individual lines or calls or courses and distances; but such surveys are to be located together, as a block or one large tract. If lines and corners made for such a block of surveys can be found upon the ground, this fixes the location of the block, even to the disregard of the call for adjoiners. The lines and corners found upon any part of the block of surveys belong to each and every tract of the block, as much as they do to the particular tract which they adjoin.

In *Pruner* v. *Brisbin*, 98 Penn. St. 202, the question came before the court below, and the principles just laid down were enunciated in that court, and upon a writ of error to the Supreme Court of Pennsylvania, Mr. Justice Sterrett said: "The thirteen tracts having been surveyed in a block and so returned must be located upon the ground as a block; neither of them can be arbitrarily located in disregard of the lines and corners found upon other parts of the block. All the lines and corners marked upon the ground and returned must be considered in ascertaining the proper location of the block. Those found upon any part of the block belong to each and every tract of which it is composed, and if sufficient lines and corners can be found they determine the location of the entire block, without regard to its calls for adjoiners or for waters, if such calls conflict with the lines actually run upon the ground and returned." He added: "It requires neither argument nor citation of authority to show that the learned judge was clearly right in thus instructing the jury." p. 210.

In *Fritz* v. *Brandon*, 78 Penn. St. 342, 351, Chief Justice Agnew says: "When one person is owner of all the warrants, they may be surveyed together in a single block by exterior lines, leaving the interior lines to be settled by the owner himself. *Mock* v. *Astley*, 13 S. & R. 382; *Stevens* v. *Hughes*, 3 W. & S. 465; *Collins* v. *Barclay*, 7 Barr [7 Penn. St.] 73; *Hagerty* v. *Mathers*, 7 Casey [31 Penn. St.] 348. The legal effect is, that the entire block is viewed as one tract. Hence, Chief Justice Lewis said, in *Hole* v. *Rittenhouse*, 1 Casey [25 Penn. St.] 491, ' Under these circumstances it is evident that the whole fifteen surveys adjoining each other in a single block, without interior lines, all made at one time and owned

by the same party, were essentially but one tract.' . . . This principle was in the mind of Chief Justice Woodward when he said, in *Malone* v. *Sallada*, 12 Wright [48 Penn. St.] 425 : 'And when we are dealing with blocks of surveys we must remember that the marks on any part of the block belong to each tract in the block.' So Judge Strong said, in *Darrah* v. *Bryant*, 6 P. F. Smith [56 Penn. St.] 75 : 'And if they were surveyed as a block, they must be located as a block.' "

In *Malone* v. *Sallada*, 48 Penn. St. 419, Chief Justice Woodward says : "Located by these adjoiners, Isaac Miller would take the land in dispute, but several of its courses and distances and the configuration of the survey as returned into the land office would essentially be changed. Notwithstanding these consequences, however, the defendants insisted upon its location by its calls. . . . The plaintiffs, on the other hand, contended that the whole block of twenty-five surveys should be located by the marks on the ground, with no other reference to calls for adjoiners than such as would be consistent with the marks on the ground; and that it is immaterial that no marks are found on the Miller survey, since authentic marks are found on other tracts of the block sufficient to locate the whole block, and that these marks apply with decisive effect to Isaac Miller. They deny also that Merrick Starr was called for on the west of Isaac Miller; but if it was, they say it was a mistake, and must be rejected in favor of the courses and distances as returned. In a word, the plaintiffs would locate the Isaac Miller by the marks on the ground of other tracts, in connection with which it was surveyed and returned. . . . And when we are dealing with *blocks* of surveys we must remember that the marks on any part of the block belong to each tract of the block. Interior lines were never run and marks are not to be looked for on them; but if marks are found upon the ground to establish an exterior line of a particular tract of the block, and we find other tracts returned with that same line, we are to presume it was adopted as the boundary of these tracts, no less than of the tracts which bear the marks. When the surveyor, for instance, ran from the

pine corner of Gilbert and Brooks to the stone corner of Lomison and Paul, his course for more than three hundred perches was S. 10° E. and his only other course for eighty-nine perches was S. 4½° E. and these two courses carried him the whole width of the Gilbert and Miller tracts, and formed the western boundary of these respective tracts. No marks are found on these lines, but the pine and stones are sufficient to locate them." p. 425.

In *Northumberland Coal Co. v. Clement*, 95 Penn. St. 126, it was held: "When original surveys have been made and returned as a block into the land office, the location of each tract therein may be proved by proving the location of the block. In ascertaining the location of a tract the inquiry is not where it should or might have been located, but where it actually was located. Every mark on the ground tending to show the location of any tract in the block is some evidence of the location of the whole block, and therefore of each tract therein." p. 137.

We think these authorities are conclusive upon this point. The principle itself was invoked by the defendant in error and by the judge below, when, at the request of the former, the judge charged the jury that if the actual position upon the ground of one single maple corner could be established, this would fix the southern line of the whole block of eleven surveys and of every member of the block. If, therefore, any original marks could be found called for and established on the northern line of any tract of the Le Fevre block, that would fix the northern line of the whole block of six surveys.

It was conceded by the plaintiff and defendant below, and stated by the learned judge in his charge to the jury, that the William Elliott was a member of the Le Fevre block, of which the Ebenezer Branham was the leading warrant and controlling survey.

A. B. Cochran, a surveyor produced by the plaintiff below as a witness in his own behalf, testified that the "post by a pine," called for by the Ebenezer Branham as a monument on its northern line, was a well recognized mark on that line; and that he found three other trees on that line west of the "post

by a pine" in the line of official courses, for 150 perches. And there were not less than five surveyors, who, as witnesses produced by the defendant, testified that they found five or six trees on the northern line of the Ebenezer Branham, in the official courses of the same line. These marks, if the jury believed the witnesses, must be regarded, according to the authorities, marks and monuments sufficient, if not overcome by the force of rebutting evidence, to fix the entire northern line of the Le Fevre block and of each tract composing it, including the William Elliott. For these reasons we consider that the inevitable effect of that portion of the charge in question was to mislead the jury.

In regard to the Francis West and Richard Martin tracts, the location of which the defendant below offered in evidence for the purpose of showing that the southern line of the Brush Valley block was run at the time of the original survey and marked upon the ground far enough south of the official courses and distances to include the land in dispute, the court charged the jury in these words:

"The Richard Martin, being a junior survey, cannot control or enlarge the dimensions of the Samuel Lobdil and the other members of the Brush Valley block, which are earlier surveys.

"The location of a junior warrant may throw some light upon the location of a senior survey which it calls to adjoin. Hence, what the deputy surveyor did in locating the Richard Martin has been admitted in evidence, and may be considered by the jury in connection with all the other evidence in determining the question whether or not the chestnut oak and the gums relied on by the defendant are trees marked by the surveyors in 1793 to define the southern line for the Brush Valley block; but should the jury find that none of those trees were marked for the survey of 1793, then the Richard Martin can have no weight in determining the location of the Brush Valley block, but the eleven surveys of that block must then be located from their fixed corners upon the northern line according to the official courses and distances, (unless, indeed, the jury should find in favor of David Rockefeller's location of the maple corner.)"

We cannot concur with this charge as a correct application of the general law of the State of Pennsylvania to the facts of this case. It is unquestionably true that a junior survey cannot control or enlarge the dimensions of a senior survey. We understand this to mean, that when the location of a survey is or can be ascertained and determined by its own marks upon the ground, its own calls and courses and distances, it cannot be changed or controlled or enlarged or diminished by the marks or lines of an adjoining junior survey; but when, from the disappearance of these original landmarks, caused by time and other agencies, from the senior survey, the location of a particular line, or the identity of a corner, is left in uncertainty or becomes the subject of controversy, then the original and well-established marks found upon a later survey made by the same surveyor about the same time, and adjoining the one in dispute, are regarded as legitimate evidence, not to contest or control, but to elucidate, throw light upon, and thus aid the jury in discovering the exact location of the older survey. In stating to the jury that such marks on the junior survey (the Richard Martin) might be considered in determining the single question whether or not the chestnut oak and gums, relied on by the defendant, were marked by the surveyors in 1793 to define the line for the Brush Valley block, " and that no weight can be attached to the Richard Martin," if the jury find that none of these trees were so marked, the judge committed error. In restricting the operation of this evidence to this one single question, to the exclusion of all other questions connected with the location of the southern boundary of the Brush Valley block, we are of the opinion that he was in direct conflict with the rule laid down by the Pennsylvania courts.

In *Clement* v. *Northumberland Coal Co.*, 87 Penn. St. 291, this very question came up as to the effect of the " post by a pine," and the pitch-pine upon the southern line of the Richard Martin, in fixing the southern line of the Mary Myers. The court below allowed this evidence to go to the jury to be considered in determining the southern line of the Mary Myers. The Supreme Court affirmed the well-established rule, that

marks upon an adjoining junior survey cannot control or enlarge the dimensions of an earlier survey, (even though the junior survey adopts the lines of the older,) but that such marks may be submitted to the jury as evidence tending to discover the actual location of the older survey. The court said : " The point, though made in the oral argument against the instruction of the learned court below, we think, is without a sufficient foundation in the charge. The judge very correctly held that a subsequent survey could not control the lines of a former, but he did not leave the case upon this single instruction, by omitting to inform the jury that the subsequent acts of the deputy surveyor in locating a junior warrant and the marks left by him on the ground, might be considered as evidence tending to disprove the actual location of the older survey. On the contrary, he answered the third point of the plaintiff below, which raised the question very plainly, so as to bring the true distinction fairly before the minds of the jury. The point is clear, and he replied : ' Marks found upon adjoining surveys made about the time of the survey are evidence upon the subject of location, but they cannot control or enlarge the dimensions of an earlier survey, even though they may adopt its lines.' Thus the jury was left to locate the earlier survey by those marks, if they should conclude that they indicated the true place of the earlier location ; and were at the same time informed that the lines of a later survey cannot alter or enlarge the lines of a former survey, although the courses and distances of these former lines may be adopted. Certainly, this was a fair instruction, and brought the charge within the precedents cited. The difference between that which is evidence of a fact and an effect which controls the fact is plain. Then, when the judge came to state the evidence of the marks found, he most distinctly referred to the pitch-pine on the southern line of the Martin tract, and the post or pine as the material matter in determining the question as to the southern boundary of Mary Myers. In the next paragraph he refers to his answers to the points and leaves the question of the boundary, as indicated by those marks, to the jury." p. 294.

The phraseology employed in this opinion of the court seems to have been adopted for the special purpose of excluding, by anticipation, the qualification added to the rule in the general charge of the court below. The case just cited says that the marks ("post by a pine" and the pitch pine) on the Martin line were rightly submitted to the jury as material matter in determining the question of the southern boundary of the Mary Myers. But the learned judge below in this case said that the Richard Martin can have r ʃ weight in determining the location of the Brush Valley block, and, therefore, of the Mary Myers, unless the jury find that certain trees relied on by the defendant bore certain marks.

In the case of the *Northumberland Coal Co.* v. *Clement,* 95 Penn. St. 126, the Supreme Court of Pennsylvania passed upon this same question as to the effect of marks upon the southern line of the Richard Martin, (which marks were "post by a pine" and the pitch pine,) as evidence to fix the location of the line that divides the Billington tract from the Walker tract, defining the southern limit of the former and the northern limit of the latter. The court said: "The official survey of the Thomas Billington calls for a small maple as its southwest corner. Maple sprouts are found at the place claimed by the defendant in error to be the southwest corner of the tract. The original surveys of all these tracts were made by Henry Donnel, acting as a deputy surveyor. It is shown that the same Donnel, in 1814, in running the northern line of the Lewis Walker tract, fixed the line between it and the Thomas Billington to be where it is now claimed by the defendant in error. The official survey of the Richard Martin calls for a white pine tree in its south line. That tree is standing and identified. That warrant was located by the same surveyor, and the return of survey was made three days before the survey of the Billington tract was returned. It calls for the Samuel Lobdil on the west, and the line between the tracts is of the same length in each survey. He had the warrants in his hands at the same time. The location of the latter throws light on the former. The location claimed by the defendant in error for the Billington is not only in harmony

with the block of surveys of which it forms a part, but also with the location of the Richard Martin made by the same surveyor soon thereafter." The counsel for the plaintiff below, in their able brief, say that there are some errors of fact in that case which detract very much from it as an authority. We do not discover in it any material errors of fact, but it is hardly necessary to consider the suggestion in view of the general concurrence of authorities in the principle therein laid down. See *Pennsylvania Canal Co. and others* v. *Kunkel,* 33 Leg. Int. 339; see also *Sweigart* v. *Richards,* 8 Penn. St. 436; *Bellas* v. *Cleaver,* 40 Penn. St. 260.

Counsel for defendant in error say in their brief: " This admitted principle of evidence, that the call of the younger was some evidence upon the subject of boundaries upon the location of the older, when both were indicated by the same deputy surveyor, never did have much weight in our court." We see nothing in the cases cited and especially relied on to sustain this assertion, but much to confirm the authority of the rule. The brief cites *Pruner* v. *Brisbin,* 98 Penn. St. 202, and says " the attempt was made, as was done in the present case, to avoid the conclusiveness of the official return of survey by the calls of a junior survey, and to locate the older surveys by such junior calls." This is not an exact statement of the issue in the case. It is just the reverse. The attempt was made to avoid the conclusiveness of the *original marks of a survey upon the ground* by the calls of its own leading warrant and by the calls of a junior survey. In that case there were original marks sufficient to establish the line of the older survey that was in dispute, and the only contest about that line arose, not from the absence of original marks upon it, but from the marks and calls of junior surveys, and also the marks of older surveys. The court decided that " the jury was properly instructed that the block of 1793, as returned to the land office, *must be located by its own marks,* and not by calls *of later surveys; or by marks found upon the ground younger than 1793.*" The construction put by counsel upon this language would bring the decision of the court into direct conflict with its own holding made at the same term and reported in the same volume.

The learned counsel for the defendant in error argue with great force and ingenuity that the rule is firmly established as the law of Pennsylvania, that after a survey has been returned into the land office for the period of twenty-one years unchallenged by any adverse claimants in the mode required by law, it is a conclusive presumption that the survey was actually made and marked upon the ground as shown by the official return. After a careful examination of the decisions of the Supreme Court cited by counsel, and some others relating to the subject, we are convinced that they are all in harmony with the conclusions herein announced. After the lapse of twenty-one years from the return of a survey the presumption is that the warrant was located as returned by the surveyor to the land office; and in the absence of rebutting facts the official courses and distances determine the location of the tract warranted. But this presumption is not conclusive, and is rebutted by proof of the existence of marked lines and monuments, and other facts tending to show that the actual location on the ground was different from the official courses and distances. Where younger surveys of fixed lines called for the older the fact is admissible, in the language of the authorities, "to aid the jury in discovering the actual location of the survey."

There are other assignments of error by the counsel for plaintiff in error; but inasmuch as they involve somewhat the principles of the points already passed upon, we do not deem it necessary to consider them farther.

*The judgment of the Circuit Court is reversed, and the case remanded, with directions to grant a new trial.*