## McCUTCHAN v. UNITED STATES.
### No. 9835.

Circuit Court of Appeals, Eighth Circuit.

March 16, 1934.

Rehearing Denied May 9, 1934.

Clyde Taylor, of Kansas City, Mo. (E. M. Jayne, of Kirksville, Mo., and E. F. Sharp, of New Madrid, Mo., on the brief), for appellant.

A. B. Lovan, Asst. U. S. Atty., of Kansas City, Mo. (William L. Vandeventer, U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before GARDNER and WOODROUGH, Circuit Judges, and MARTINEAU, District Judge.

WOODROUGH, Circuit Judge.

The appellant, Jerome B. McCutchan, was convicted together with one Darby A. Day of conspiracy to violate the Mail Fraud Act (Section 215, Cr. Code [18 USCA § 338]), and was convicted on separate counts of having devised a scheme and used the mails in furtherance thereof as denounced by said section. Mr. McCutchan alone appeals.

It appears that Mr. McCutchan has had extended experience in various lines of the insurance business and is very familiar with it. He had informed himself that in 1929 and 1930 there were small insurance companies engaged in writing particular lines of insurance, such as casualty and indemnity, desirous of merging into larger units, believing in the advantages of size. He also informed himself of certain lumber companies which owned great tracts of land in Southeastern Missouri in the Mississippi river bottom, referred to as cut-over timber land; the Gideon Anderson Company having about 15,000 acres and the Himmelberger-Harrison Lumber Company about 22,000 acres. He conceived the idea that these lands could be platted into comparatively small parcels, and then the parcels could be deeded to a large number of individuals who would give back promissory notes and mortgages on the several parcels, so that there would be a large block of mortgages which would, on their face, appear to be purchase-money mortgages. The idea as subsequently worked out was to send to a labor agency in St. Louis and get irresponsible men off the streets at about $2.50 a head to sign up these mortgage papers and be named as grantees in the deeds.

Mr. McCutchan's scheme was to incorporate an insurance company in Illinois to be known as the Chicago Fidelity & Casualty Company with capital stock in the amount of $2,500,000 in shares of $40 par value, to be sold at $62.50 per share, and he induced the owners of the cut-over timber lands to trade their lands for shares of stock in the corporation; the Anderson Company to get 7,000 shares and the Himmelberger Company 12,320 shares. In this trade, however, neither the Anderson Company nor the Himmelberger Company were to part with their timber rights in the land, but in each of the deeds there was the expressed reservation in their favor of "the right to cut and remove all timber in accordance with the reservation"

contained in certain deeds, including the right of entry and user for such purpose. There was also a contract that Mr. McCutchan and Mr. Day undertake to resell the Himmelberger stock for $50 a share net. The $2,500,000 capital stock was to be fully paid up, $1,400,000 of it being represented by the notes of the straw men secured by mortgages on the parcels of land; said mortgages securing loans at the rate of thirty to sixty dollars per acre and reciting that they were executed to secure "part of the purchase money." Stocks in an investment company and other stocks in an apartment house company, all of about $400,000 face value, were also put in for the capital stock of the company, and, although the evidence does not disclose exactly how the total $2,500,000 capital stock issue was paid for, the evidence does show, without dispute, that there was no money paid in to the corporation except that the sum of $1,000 was furnished in cash by one Addenbrook, not otherwise mentioned in the case.

The Illinois statutes (Smith-Hurd Rev. St. Ill. 1931, c. 73, § 205) provide that the capital of an insurance company may be invested, among other things, in mortgage loans upon unincumbered property worth double the amount of the loan thereon subject to the approval of the insurance department of the state, and it was part of the scheme to have accompanying each of the mortgages referred to a certificate of appraisal of each tract of land at a valuation exactly twice the amount of the mortgage thereon. In the matter of the appraisal of the lands it appears that an incident of McCutchan's plan was to put some 3,000 and odd shares of the capital stock of the new corporation into a trust fund to be sold, the money to be invested in paying taxes and making improvements upon the lands, which made it possible for him to procure appraisals of the land on the basis of its being improved land. It appeared that the appraisers who appraised on the Himmelberger tract wrote up a separate memorandum to accompany their appraisals wherein they recited that their appraisals were made upon the basis or assumption of half of the land being improved. In a letter which Mr. McCutchan wrote concerning the appraisals at the time they were being made, he said: "In the appraisal that I suggested to Homer that we would need in order to meet the requirements of the Insurance Department, we are setting aside $350,000 out of loans that we are putting on these lands to put back in improvements and for the expenses of reselling. So that the appraisal that we have asked for of $70.00 an acre will mean from $12.00 to $15.00 an acre of the money will be spent on improvements, which I felt after this amount is put back on the land in the way of houses, barns and fences and clearing that those lands would actually be worth $70.00 an acre. These are matters that I will discuss with you when I see you." Although by these means apparently respectable owners of land in that part of the country were induced to make the appraisals (some qualified by separate memoranda as above stated), Mr. McCutchan in the same letter referred to, said: "Of course I appreciate and know that you know that the appraising of farm lands at this time can not be made on the basis for what they would sell for in cash. Neither is that true of any property in Chicago."

Undoubtedly, the effect of the supervisory powers reserved to the state of Illinois over the capital structure of insurance companies; the legal requirement that their mortgage loans be secured by lands worth double the amount of the loan, subject to the approval of the state insurance department; the method of issuing the $40 par value stock for sale at $62.50 and the issuance of a prospectus showing fully paid-up stock of two million and a half—the total effect was to present an appearance of great financial strength in the company. It was the plan of Mr. McCutchan to arm himself with a balance sheet and prospectus of the Chicago Fidelity & Casualty Company upon the completion of its organization, and in the name of the company, to buy up small going concern insurance companies; the plan being to induce stockholders of such companies to trade their stock for the stock of the Chicago Fidelity & Casualty Company and effect mergers of such companies into the Chicago Company. Then their insurance business would be carried on under sponsorship of the Chicago Company.

The codefendant, Mr. Darby A. Day, appears to have been an insurance man in Chicago of very good reputation and standing, with considerable resources and credit. There is no direct testimony to prove that he had anything to do with the transformation of the cut-over timber lands into the appearance of purchase-money notes and mortgages, and he claims not to have been aware of the way Mr. McCutchan had procured the notes and mortgages to be made by straw men. He testified that the year before he met McCutchan he and some associates had proceeded to obtain a charter for the Chicago Fidelity & Casualty Company, and that the organization of the company was lying dormant when McCutchan stated that he could finance it; "that he had full financial backing." Day testified: "At

this time Anderson and Himmelberger came into the picture, the first I had heard of them. I heard of them as two groups having $1,400,000 of securities which had been submitted to and approved by the Illinois Insurance Department."

The first acquisition that was made for the Chicago Fidelity & Casualty Company was the purchase of a Missouri insurance company called the Indemnity Company of America. Mr. McCutchan and certain of his then associates had owned the stock of this Missouri company in 1921 and had sold it in 1922 and McCutchan knew of the stock being again for sale in 1929. Although the stock in the Missouri company was not bought in the name of the Chicago Fidelity & Casualty Company, but was paid for by promissory notes of Mr. Darby A. Day and a Darby Day Investment Corporation controlled by Mr. Day, the acquisition was intended to be for the Chicago Fidelity & Casualty Company, and was a part of the general plan for the merger of insurance companies with the Chicago Company. After acquiring the Missouri company (Indemnity Company of America) Mr. McCutchan and Mr. Day succeeded in acquiring the capital stock of and the control of three other substantial insurance companies by merging them with the Chicago Fidelity & Casualty Company, a trade of the capital stock of the Chicago Fidelity & Casualty Company for the stock of the companies acquired figuring in each transaction, and also a substitution of the straw men's notes and mortgages on the cutover timber lands for good and valuable assets owned by the acquired companies. All of this appears to have been accomplished without any disclosure of how the securities put into the capital structure of the Chicago Fidelity & Casualty Company had been made up. In other words, Mr. McCutchan succeeded completely in making it appear that the Chicago Fidelity & Casualty Company was a two and a half million dollar insurance corporation with its capital fully paid up as contemplated by the laws of Illinois, and with a capital structure composed mainly of good notes secured by approved purchase-money mortgages on lands worth double the loans, and that its capital stock had been subscribed for at $62.50 for each $40 par value share.

The Missouri insurance company (Indemnity Company of America) was at all times doing business in Missouri (exclusive automobile insurance), but it was desired to procure licenses for the company to do business in other states, and with that end in view

Darby A. Day wrote to the insurance commissioner of California in April of 1930 as follows: "On February 26, 1930 we purchased the entire capital stock of the Indemnity Company of America from the former owners. We found the records and physical being of the Company in rather a chaotic condition, which we at once set about to correct, and are generally placing the house in order. We are also owners of the controlling interest of the Chicago Fidelity and Casualty Company recently organized and licensed in March of this year by this State. It is the purpose to affiliate these two companies, and the affairs of the Indemnity Company of America will be conducted under the sponsorship of the Chicago Fidelity and Casualty Company. The capital of which is $1,000,000 with a net surplus of $1,000,000. * * * On the 16th instant, our Board of Directors, of which the Chicago Fidelity and Casualty Company, are going to pass a resolution to purchase from the Darby Day Investment Corporation all of the capital stock of the Indemnity Company of America, and contribute to the Indemnity Company $100,000 additional surplus. * * * In our examination of the Company, which was thorough, careful thought was given the necessary procedure for its rehabilitation, and plans put under way to by sale, exchange or trade improve the investment account quickly and materially in passing the ownership of the Company to the Chicago Fidelity and Casualty Company. We are experienced insurance men with the reputation for probity ability and knowledge of our business. We purpose to conduct our business on a strictly ethical and lawful basis and comply with the laws, rules and regulations of the various Insurance Departments, and while we appreciate that your criticism is just, we believe that you will consider the fact that the objectionable features are of our inheritance and not of our making, and give us an opportunity and time to correct the same, which is being done, and will be accomplished as rapidly as is humanly possible. * * * We trust, therefore, that we may be given a license to operate in your good State."

It is clear that it was a part of the scheme to be carried out through the two and a half million dollar Chicago Fidelity & Casualty Company to make the Missouri company (Indemnity Company of America) function and actively do insurance business as a subsidiary. It is sufficiently obvious that, if the Missouri company, the first acquisition and subsidiary of the Chicago Fidelity & Casualty Company, should be questioned or fail to secure

its licenses in the different states, the contingency would impugn the strength of the Chicago company. Accordingly, and as a step in the same general plan, Mr. McCutchan and Mr. Day took up with the Missouri insurance department the matter of depositing securities with that department on behalf of the Indemnity Company of America (the Missouri company). The Missouri insurance department was to make its own investigation of the value of the securities without expense to it, but was asked to make certificates in the meantime to the effect that approved securities had been deposited for the protection of the holders of policies in the company. As a result of negotiations, the defendants caused a number of the notes and mortgages executed by the straw men to be taken out of the assets of the Chicago Fidelity & Casualty Company and transmitted by United States mail to the insurance commissioner of Missouri to be deposited with him for the protection of the policyholders of the Indemnity Company of America (the Missouri company). The face amount of the notes so deposited aggregated some $400,000, and an appraisal sheet accompanied each mortgage. In consideration of such deposit and pending his own investigation, the Missouri insurance commissioner issued to the defendants some twenty certificates reciting that the insurance company had on deposit with the insurance department in approved securities $200,000 as of July 7, 1930 for the protection of its policyholders. Although the evidence does not show what, if any, use the defendants subsequently made of these certificates so obtained from the Missouri insurance commissioner, the purpose of obtaining the certificates plainly was to use them to obtain licenses to do business in other states and to give an appearance of strength to the Missouri company, and so to further the execution of the scheme that has been outlined.

After the discovery and determination by the Missouri insurance commissioner that the securities deposited with him were insufficient, the revocation by him of his deposit certificates and the subsequent collapse of the whole of defendants' far-flung projects and the appointment of receivers for the various companies, the records and documents were made available to the prosecution, so that, on the trial, very few of the essential facts were disputed and the general course of the transactions was clearly revealed.

The witnesses for the prosecution and the defense developed a very complete and exact picture of the cut-over timber lands before the jury with no substantial conflict upon matters of fact. They are level wooded lands, the soil being a silt deposited by the river to a great depth, and it has been demonstrated that similar lands in that country, when reduced to cultivation, are productive of large crops. Extensive flood protection work has been done by the government along the river. There are no considerable marshes, and some highways have been constructed. The bulk of the merchantable timber has been removed, and the land is covered with smaller growth, brush, and down logs. The method of clearing is to remove such logs and growth, leaving the stumps to rot and be worked out in the course of three or four years by one mule plowing between the stumps. There seems no reason to doubt that the land is adapted to and will ultimately when cleared and cultivated support a large population. At the time the straw men's notes and mortgages were put into the capital structure of the Chicago Fidelity & Casualty Company in the fall of 1929 and the spring of 1930, there was no market for the land for agricultural purposes. All of the lands were subject to the lien of unpaid taxes at the time in question, which are shown in the testimony by the lump sums due on the several tracts and have not been averaged. They amount to at least $8 an acre on the Himmelberger tracts and perhaps a little less on the Anderson. As some 35,000 acres are involved, the total of the taxes amounted to a large sum. To clear the land for one mule plowing around the stumps would cost around $5 to $8 an acre, and witnesses corroborated the statement of McCutchan in his letter above referred to, that from $12 to $15 an acre would suffice to partly clear and equip with houses, barns, and fences at least a percentage of the lands.

Notwithstanding the absence of any market for the lands for agricultural purposes, the trial court received opinion testimony concerning value, and all who had an opinion were permitted to testify to it. The opinions ranged from no value at all up to $25 per acre, but no one except Mr. McCutchan was willing to swear to a value comparable to those set out in the appraisals procured by him for his incorporation purposes.

The indictment, unavoidably voluminous, sufficiently charges that the plan to transform the unmarketable lands into the similitude of commercial insurance securities and to set up the capital structure of a two and a half million dollar Illinois insurance company with them, and to acquire and carry on going concern insurance companies through such

means, and to obtain money and property by misrepresentations, was a scheme to defraud; and that it was devised by the defendants, well knowing "that said notes and deeds of trust were not proper securities," and that "the land described in each deed of trust had very little value," and "did not have a value equal to the amount of the note purported to be secured" and "was not worth twice the amount of the notes."

The instructions of the trial court were also necessarily extended explaining the issues and declaring the law fully and exactly, so that no complaint is presented to us concerning the instructions.

Although there are some thirty-eight assignments of error presented on this appeal, argument in support thereof is condensed into two main contentions. The first argument is that the indictment and the proof attempt to fix more than one scheme to defraud upon McCutchan—at least two. One a scheme to defraud such persons as he could induce to believe in the strength and solvency of the Chicago Fidelity & Casualty Company and, in that belief, to buy the stock of that company; and another distinct different scheme to defraud such persons as he could induce to take out insurance policies in the Missouri insurance company (Indemnity Company of America, the name subsequently changed to Continental Indemnity Company of America). The argument is further that, in the transaction where deposit of securities was made with the Missouri insurance commissioner to protect policyholders of that company, although the mails were used, there was no dishonesty or fraud, but that the whole transaction was simply an honest contribution of capital to the Missouri insurance company for the protection of its policyholders. It is then contended that, in the promotion, organization, and carrying on of the transactions of the Chicago Fidelity & Casualty Company there was no use of the mails charged or relied on by the government.

If this view of the case is sound, it would follow, as argued, that Mr. McCutchan did not have a fair trial. If the court only had jurisdiction over the transaction concerning the Missouri insurance company by reason of the use of the mails in that transaction, and if there was no federal jurisdiction over the Chicago Fidelity & Casualty Company transactions for want of use of the mails in furtherance of those transactions, then the protracted inquiry into the latter transactions, carried on before the jury for days, was prejudicial.

But we cannot accede to the premise. The flotation of the Chicago Company was, in the first place, the inducement by means of which Mr. McCutchan drew Mr. Darby A. Day into his scheme, and Mr. Day was a man of means and standing in the insurance business, able, as the evidence shows, to consummate, out of his own credit, the first of the acquisitions that were in contemplation by Mr. McCutchan when he set his scheme in motion. Mr. Day, having been drawn into the enterprise and having taken (or intending to take) the presidency of the Chicago Company, was relying upon the appearance of strength and solvency of that company in all that he did. In his letter to the California insurance commission requesting a license in that state for the Missouri company, as quoted above, he said, "the affairs of the Indemnity Company will be conducted under the sponsorship of the Chicago Fidelity and Casualty Company." It is also apparent that the transactions with the Missouri insurance commissioner were in furtherance of the business of the Chicago Company, and that the assets used to protect the policyholders of the Missouri company were the assets of the Chicago Company. The Missouri transaction was the kind of business for which the Chicago Company was set up. It was to take over other companies and keep them going out of its simulated resources, the resources being suitable in form for such purposes but not in substance.

The contention, therefore, that the Missouri transaction can be segregated from the scheme, isolated, or considered by itself alone, is not tenable. The transaction was in fact and therefore, in law, a step in execution of the general scheme. The mails were used in this part of the execution of the scheme, and so the whole scheme to defraud was brought within the jurisdiction of the federal court. The trial court was not in error, therefore, in overruling the demurrer to the indictment or in receiving evidence concerning all of the various transactions carried on in Texas and Ohio and Illinois, as well as in Missouri, in execution of the scheme to defraud. Nor was there error in receiving evidence upon any or all of the many transactions had by defendants in execution and furtherance of their enterprise which tended to reflect the scheme in operation and the intent of the defendants. Hendrey v. U. S. (C. C. A.) 233 F. 5; Stunz v. U. S., 27 F. (2d) 575 (C. C. A. 8); Garvey v. U. S., 4 F. (2d) 974 (C. C. A. 2); 49 Corpus Juris, 1217.

The other main contention elaborated and relied on for reversal is that the trial court

erred in excluding testimony offered for the defense. It is presented that, whether the cut-over timber lands were of great value or not, Mr. McCutchan honestly believed them to be so and, therefore, had the right to show to the jury whatever information had come to him upon which his honest belief was based. The argument is that the trial court misconceived the law on this defense. Counsel say in their brief: "The fundamental error into which both counsel for the government and the court below fell was in the conception that the ultimate issue here on the question of fraud was actual value. This involves a strange misconception of the real issue. * * * Actual value is not the ultimate issue, but it is, did the defendant in good faith believe that the values were as represented. If defendant * * * in good faith, believed that his representations of value were true then he is not guilty, even though actual value was but a small part thereof, or even though there was no value whatever."

The record does not bear out the contention. On the contrary, it reveals the clear understanding on the part of the trial judge that an honest belief on Mr. McCutchan's part would be a complete defense to the prosecution. He instructed the jury:

"If they (the defendants) were of the opinion of course, in good faith of the opinion, if they believed upon the evidence and such evidence as would cause a reasonable man to believe that these mortgages were well secured or doubly secured, that is to say that the land back of them was worth double the amount of the loans, then of course there is no case for the government here, if they believed that in good faith, because a scheme to defraud presupposes that the persons who enter into the scheme to defraud and devise a scheme or artifice to defraud are doing it with knowledge that they are going to deceive somebody, because the indictment here says that they conspired, entered into an artifice or scheme to defraud persons of their property by false pretenses and by false promises, and by false representations. So that the man who makes a representation that he believes to be true is not guilty of fraud unless he recklessly makes the representation. * * * *"

"* * * You gentlemen then will ask yourselves: What did these defendants know about these securities? * * * What was the knowledge of these defendants with respect to the securities? * * * What opportunities did they have to acquire knowledge? * * * Now, the whole question is: What information did these defendants have

with respect to this land and with respect to its value, and whether or not it measured up to the requirements of the law that it should be double the amount of the loans made thereon or of the notes secured thereby? * * * *"

"* * * Now gentlemen, if you believe that he acted in good faith, * * * that whatever he did was in good faith and the confident belief that these securities measured up to the requirements of the law, and that his representations were true, and if you find that they were not recklessly made, that he was not intending to deceive anybody or make false representations or promises, then of course, gentlemen, if that was his attitude at the time, then he could not be a conspirator, and of course so far as the defendant McCutchan is concerned, you would find them not guilty on the first count. * * * *"

"* * * On the other hand, if you find that either one of them or both of them acted in good faith at the time it was proposed to use these securities as the principal part of the capital structure of an insurance company, if you find that either one of them acted in good faith, then, gentlemen, there is no crime so far as the first count is concerned. * * * *"

"* * * When you go to your jury room you will say to yourselves: What about these securities? * * * If * * * you find they were not double the value, then your question is: Did these defendants, or either of them know they were not worth double the value and did they intentionally misrepresent and deceive the Insurance Department and through them the policyholders and stockholders and those who might buy policies and buy stock? It is your question."

Plainly there was no fundamental misconception on the part of the trial court. There was clear understanding that McCutchan claimed to have honest belief in the value of the lands; that proof of facts tending to justify such belief was competent, and that, if honest belief existed, there was no offense. Consideration must be narrowed to the inquiry whether competent testimony offered tending to justify the belief was erroneously excluded.

The appeal record does not present that question for review by this court. There are only two assignments of error found in the record predicated upon the exclusion of testimony by the trial court. They are as follows:

"The District Court erred over the objection and exception of defendant in refusing to permit the defendant to prove facts that

were relevant and material to the issues in the case, which said evidence and the offer of proof thereof were as follows:

"Mr. Sharp: Defendant now offers to prove by the witness Homer Myers, now on the stand, that as a result of his investigations, made in the manner which he has just testified, that when he came back to St. Louis he reported to Mr. McCutchan that the land had been represented to him by the above named responsible land owners as being worth $40 to $70 an acre, or $60 to $90 an acre, and defendants except to the refusal of the court to permit them to make this proof."

And:

"The District Court erred over the objection and exception of defendant in refusing to permit the defendant to prove facts that were relevant and material to the issues in the case, which said evidence and the offer of proof thereof were as follows:

"Mr. Sharp: Defendants now offer to show by the witness Downie that each of the loans outlined in red on Defendants' Exhibits 2, 3 and 4 were made, together with the date of said loans, the parties to the loan, and the amount of said loan in dollars and cents, and further offer to prove the condition, kind and character of the land involved in each of these loans, and further offer to show that said loans were made by insurance companies, regular farm mortgage companies, joint stock land banks, and federal farm loan banks, and that defendants knew, in a general way, of these loans and the amounts thereof; and now object and except to the refusal of the court to permit them to make such proof.

—for the reasons stated in said offer; and for the further reason that in connection with said offer of proof, the defendants offered in evidence Defendants' Exhibits 5, 6 and 7, being an abstract of some mortgages on lands in the immediate neighborhood and vicinity of the lands known in the record as the Anderson lands, and said exhibits being referred to in Defendants' Exhibits 2, 3 and 4, and which exhibits were excluded over the objection and exception of defendant."

The offer referred to in the first of these assignments of error is found on page 130 and the second on pages 155 and 156 of the record before us. Examination of these pages of the record discloses that there was no objection on the part of the government to either of the offers made, and that there was no ruling made on the offers by the court. Each of the offers would appear by the record to have been made by counsel for defendants

in such a general way that it was not required of the court to make a specific ruling. At least, none was made, and it is well settled that it is indispensable to a review in the federal courts of any ruling of a trial court upon procedure or evidence that it should be challenged, not only by an objection, but by exception taken and recorded at the time, and that the objection, ruling, and exception be embodied in the bill of exceptions. Mexico International Land Co. v. Larkin, 195 F. 495 (C. C. A. 8); Board of Com'rs of City and County of Denver v. Home Sav. Bank, 200 F. 28 (C. C. A. 8); Potter v. U. S., 122 F. 49 (C. C. A. 8); Reeder v. Morton-Gregson Co. (C. C. A.) 296 F. 785; McFarland v. Central Nat. Bank, 26 F. (2d) 890 (C. C. A. 8); Wear v. Imperial Window Glass Co. (C. C. A.) 224 F. 60; St. Clair v. U. S. (C. C. A.) 12 F.(2d) 376; Federal Intermediate Credit Bank v. L'Herisson (C. C. A.) 33 F.(2d) 841. In Gibson v. Luther, 196 F. 203, 204 (C. C. A. 8), this court stated:

"On the contrary, it appears that neither party ever asked or insisted that the court rule on the objections so made, and it appears that the court never did rule on them, except as its view of them might be inferred from the judgment ultimately rendered in the case.

"Objections of this kind, unaccompanied by rulings or exceptions, present nothing for review by an appellate court."

Further clarification is given the rule in Fruth v. Benassi, 219 F. 549, 550 (C. C. A. 8): "If we shall in a spirit of fairness treat the record as showing the motion renewed, it does not carry us far, as there must have been a ruling and exception thereto in order to review the questions sought to be raised, and in the same spirit of fairness towards the court we cannot treat the record as showing a ruling which, so far as the record shows, was never made." See, also, Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 215 F. 362, 365 (C. C. A. 8), wherein this court said: "Moreover, the objection which has been considered was never called to the attention of the court below, or ruled by it, and an appellate court cannot declare that the trial court erred in a ruling that it has never made upon a question never presented to it. Objections to evidence and motions noted by an examiner in the taking of testimony in equity must be ruled by the court, and exceptions must be taken to those rulings, and both rulings and exceptions must

be made a part of the record before they become reviewable in the court above." There being no ruling by the trial court upon either of the offers to prove, the assignments of error are not sustained and afford no justification for the review or reversal of the case.

Neither of the offers to prove reflects a summarizing of testimony excluded by specific rulings of the court duly excepted to. On the contrary, throughout the whole examination of the witness Homer Myers, pages 123 to 133 of the record, no exception is shown to have been taken to any ruling of the court in receiving or excluding his testimony. And exactly the same is true of the entire examination of the witness Donald A. Downie. Although Defendants' Exhibits 2 to 7, inclusive, produced by Downie, were offered in evidence, they were admitted, save that a certain list of mortgages was admitted only in part. It is only to this partial exclusion of the lists of mortgages that any exception is noted in the record.

It will be observed that the offer to prove by the witness Homer Myers was that Myers reported to Mr. McCutchan estimates of value made by responsible persons in the amount of $50 to $70 an acre or $60 to $90 an acre. The record shows that the witness had already testified on exactly the same matter over objection by the government that he had reported to Mr. McCutchan that "the information that I got from those people it ran anywhere from $25 to $100 per acre."

■ It will be noted as to the offer to prove by the witness Downie that the offer does not show that the loans offered to be proven would tend to help the defense. The offer was to prove the condition, kind, and character of the land involved, and who made the loans, and that the defendants knew about the loans "in a general way"; but no facts were stated about the loans to show that they are comparable to those used by Mr. McCutchan, or that the offered testimony would be helpful to the defense. If the trial court had made a ruling excluding the offer, such ruling would have been fully sustained by the language of this court in Ladd v. Missouri Coal & Mining Co. (C. C. A.) 66 F. 880, at page 882. In that case the court considered an offer to prove a conversation had, but it did not appear in the bill of exceptions before this court what the conversation was. This court said: "It will be observed that all that the plaintiff offered to prove was 'the conversation between him and Murdock relating to the

contract.' This offer was not accompanied by any statement as to what that conversation was, or that it was material to any issue then being tried. The insufficiency of the exception is rendered apparent by a single consideration. If this court should reverse the case because the witness was not permitted to state the conversation, what is there in this record to show or suggest that upon another trial, when the witness is allowed to state the conversation, a single word of it will be material to the case or admissible in evidence? The offer to prove the 'conversation,' without some statement as to what it was, and showing its materiality, was too general to be made the foundation of a valid exception. The rule is well settled that the bill of exceptions must show the materiality of the evidence which was tendered and rejected. The evidence rejected, or a statement of what it tended to prove, must appear in the bill of exceptions. Packet Co. v. Clough, 20 Wall. 528 [22 L. Ed. 406]; Railway Co. v. Smith, 21 Wall. 255 [22 L. Ed. 513]; Thompson v. Bank, 111 U. S. 529, 4 S. Ct. 689 [28 L. Ed. 507]; Clement v. Packer, 125 U. S. 309, 8 S. Ct. 907 [31 L. Ed. 721]; Patrick v. Graham, 132 U. S. 627, 10 S. Ct. 194 [33 L. Ed. 460]; Lyon v. Batz, 42 Mo. App. 606; Bener v. Edgington, 76 Iowa, 105, 40 N. W. 117." See, also, 26 Ruling Case Law, page 1032, § 35. So in this case there is nothing in the bill of exceptions before us to indicate that, if we reversed the case, Mr. McCutchan would be able on another trial to produce any loans in the vicinity tending to justify his belief.

■ Notwithstanding the assignments of error present no ground for review or reversal by this court, as it is open to us to reverse for prejudicial error manifest on the record, we have searched to ascertain whether there was erroneous ruling excepted to which prevented Mr. McCutchan from disclosing to the jury any competent testimony tending to justify an honest belief in the value he had caused to be put on the lands.

He testified to his familiarity with the lands and that he had loaned over $156,000 "in Northeast Arkansas south of these lands on the Mississippi River on the same kind of land as the Anderson and Himmelberger lands," and that he had sold over $800,000 of mortgages in Southeast Missouri to automobile and surety and casualty insurance companies, and had come in contact with the purchasers, appraisers, and their agents. He named a number of persons with whom he

talked about Southeast Missouri land. He employed Homer Myers, considering him of good judgment as regarding farm values, to make an inspection, talk to land owners and get a general opinion. "Following that Myers made a report to me of his trip." There was objection to the question of what the report was, but, after colloquy, the court said, "Very well, go ahead and put it in." Mr. McCutchan thereupon testified what had been reported to him by Homer Myers. Mr. McCutchan also said, "My belief at the time was that these lands were worth the appraisements. I believe it today. I still think they are worth it."

It does not appear that McCutchan was prevented either from testifying to his belief in the value of the lands or to any reports or information touching upon the value which might have tended to justify his belief. There is no comment or ruling of the court indicating that such information would be deemed incompetent. On the contrary, where it was made to appear to the court that there were reports and information brought to McCutchan upon which he said he relied, the court admitted them.

Turning to the testimony of the witness Homer Myers, we find he corroborates Mr. McCutchan's testimony about his employment by Mr. McCutchan and directions given him to find out what he could regarding the lands and reporting the result to Mr. McCutchan. The question was asked him: "Q. Did you make your report to Mr. McCutchan as to the value of this land as you ascertained it? A. I did." And thereupon the witness testified as to what he reported. Although objection was made for the government that what the witness told McCutchan about information received from others was not competent, the specific declaration of the court was: "I think it would be competent for him to say what he told Mr. McCutchan."

As to the testimony of the witness Donald A. Downie: There were two examinations of this witness. On the first he testified for the government that pursuant to his employment by McCutchan he had procured the straw men through the labor agency in St. Louis and had had to do with the appraisals and knew a great deal about the lands in question. When this witness was again called to testify he brought with him Defendants' Exhibits 2 to 7, consisting of maps of lands in the vicinity of the Anderson and Himmelberger tracts and also of lists of mortgages, which mortgages bore numbers corresponding with the tract numbers on the maps. The witness said that he had prepared the maps for another investigation in another suit, and that he had gone over the lands years ago and had been over some of them the last 8 or 10 years, "went over a lot of them 20 years ago." The record indicates that it was the purpose of the defendant to have the witness pick out mortgage loans from his lists and describe the loans and the land securing them. The witness had already testified to his opinion of the value of the lands in question, and the colloquy between the court and counsel reflects hesitation on the part of the court to pursue such a long line of inquiry without assurance that it would fairly tend to support the defense of honest belief on McCutchan's part. Nevertheless, the court permitted the witness to proceed. He picked a loan from his list, and it was developed that it was a loan made by a private individual in 1920 upon 320 acres of land, and that the witness did not know what the condition nor value of the land was at the time of the loan. Upon the court's sustaining an objection to further testimony about that loan, no exception was taken. The witness then picked another loan from his list, being a loan of $12,000 upon 320 acres of land of which about three-fourths was under cultivation and which had fair buildings on it —not elaborate, but better than the average—the cultivation having gone on for almost 10 years. The witness then picked another loan which was upon 2,600 acres and was in the amount of $70,000, or about $27 per acre. During the course of this examination the court had commented: "If they (the defendants) say the loans were made (meaning loans on similar land of approximately 50% of the appraised value), they relied on these loans and supposed the other land upon which loans were made were in conformity with that 50% law, they can say that to the jury as expressive of their good faith." But up to this time no ruling of the court had been made to which any exception was taken, nor had the witness been prevented from picking out such mortgage loans as were desired, and describing them, and it was at this stage of the proceedings that the defendant made the offer to prove upon which the assignment of error is based, following up later with the offer in evidence of the maps and the lists of mortgages.

The record does not persuade that the trial court was unwilling to receive any proof that would tend to show information on the part of McCutchan that mortgages comparable in kind or in land valuation to those he

668

used had been taken in that community. It indicates rather that the court was not satisfied that the particular mortgage loans which the witness had picked out of his lists did help the defendant. They did not seem to the trial court to be comparable to any of the mortgages used by Mr. McCutchan in his enterprise (and they were not). Still, the court refused to strike them out on the government's motion and left the testimony to the jury's consideration.

Whether the witness did have any loans on the lists that might have been helpful to Mr. McCutchan does not appear, as the exhibits are not included in the record. The trial court saw them and excluded them. This court cannot assume that he was in error. Certainly the bill of exceptions before us does not disclose any single loan taken in that country tending to justify Mr. McCutchan's belief in the securities he procured to be made and used in his enterprise, either received in evidence or offered and excluded.

If, in fact, McCutchan knew of transactions had by others concerning lands in the same vicinity as those in question and similar thereto, and relied upon such transactions to justify his belief in his appraised values, the record does not disclose that the trial court would have prevented him from making such proof. It is clear that a great many loans had been made by insurance companies and others, but the only fair inference from the record is that no loans comparable to those used by Mr. McCutchan or tending to justify his belief could be shown on his behalf. The appraisals were procured for him upon his promises of improvements to be made in the future. They were not made upon values then present in the lands, and his appraisers testified that the lands had no such values as were put on them.

It would seem from an offer appearing in the record that Mr. McCutchan had succeeded on a former occasion in disposing of a group of mortgages something like those involved here to an insurance company for cash and stock, but it is not assigned that there was any error in the refusal of the court to go into that transaction.

On the whole record, it appears that the indictment in this case fully informed the accused of the nature and cause of the accusation against him; the testimony adduced was within the indictment, tended to sustain the charge and supported the verdict; the trial was fairly conducted; none of the assignments of error justifies reversal, and the conviction must stand.