## GALATAS v. UNITED STATES, and three other cases. *

### Nos. 10237, 10238, 10241, 10246.

Circuit Court of Appeals, Eighth Circuit.

Nov. 18, 1935.

Rehearing Denied Dec. 6, 1935.

*Writ of certiorari denied 56 S. Ct. 574, 80 L. Ed. —.

Charles S. Walden and James Daleo, both of Kansas City, Mo. (Henry L. Balaban, of Chicago, Ill., and W. N. Andrews, of Kansas City, Mo., on the brief), for appellants.

Thomas A. Costolow and Sam C. Blair, Asst. U. S. Attys., both of Kansas City, Mo. (Maurice M. Milligan, United States Attorney, and Randall Wilson, Asst. U. S. Atty., both of Kansas City, Mo., on the brief), for the United States.

Before GARDNER, WOODROUGH, and FARIS, Circuit Judges.

GARDNER, Circuit Judge.

Appellants, who will herein be referred to as defendants, with Esther Farmer, Frances Nash, Elizabeth Galatas, and Vivian Mathis, were indicted on a charge of conspiracy to violate section 753i, title 18 U.S.C.A., 46 Stat. 327, § 10.

The indictment as originally returned contained three counts, but at the close of all the evidence the government dismissed counts 2 and 3 as to appellants, and dismissed all the counts as to the defendant Frances Nash. Upon the impaneling of the jury, the defendant Vivian Mathis withdrew her plea of not guilty and entered a plea of guilty to count 1, and the other defendants were found guilty on count 1.

The assignments of error challenge the ruling of the court (1) in overruling defendants' demurrer to the indictment; (2) in denying defendants' request for an instructed verdict of not guilty; (3) in refusing certain requested instructions; and (4) in giving certain instructions.

The indictment charges that on March 1, 1929, Frank Nash was convicted in the United States District Court, for the Western District of Oklahoma, of the crime of assaulting a United States mail custodian, and was sentenced to imprisonment in the United States Penitentiary at Leavenworth, Kan., on March 3, 1924; was duly received and imprisoned in that penitentiary, and that while so imprisoned, and before his sentence had been served, on October 19, 1930, he escaped from the penitentiary and remained at large, a fugitive from justice, until June 16, 1933; that on June 16, 1933, at Hot Springs, Ark., he was apprehended and taken into custody by agents of the United States Bureau of Investigation of the Department of Justice, for reincarceration in the United States Penitentiary at Leavenworth, Kan. It is then charged that the defendants, and numerous and divers other persons, conspired and confederated together to violate the laws of the United States of America, and particularly the laws pertaining to persons who procure the escape of any prisoner properly committed to the custody of the Attorney General, "in this, that they would thereafter unlawfully, wilfully, knowingly and feloniously procure the escape of the said Frank Nash from the custody of the Attorney General, which said Frank Nash was then properly committed to the custody of the Attorney General, pursuant to the direction of the Attorney General, and would unlawfully, wilfully, knowingly and feloniously advise, connive at, aid and assist in the escape of the said Frank Nash from the custody of the Attorney General of the United States and the duly authorized representatives of the Attorney General."

1. The sufficiency of count 1 of the indictment was challenged below by separate demurrers which were overruled. Defendants direct their attack to that part of the indictment which charges that Frank Nash was properly committed to the custody of the Attorney General. Revised Statutes, § 5440, as amended, title 18 U.S.C.A. § 88, prohibits, among other things, two or more persons from conspiring to commit an offense against the United States. In an indictment for conspiracy to commit an offense, the conspiracy is the gist of the offense, and it is not essential to allege with technical precision all the elements of the offense which is the object of the conspiracy, nor to state such object with the detail required in an indictment for committing the substantive offense. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Safarik v. United States (C.C.A.8) 62 F.(2d) 892. The criminal statute, the violation of which was the alleged object of the conspiracy, is section 753i, title 18 U.S.C.A., which provides that: "It shall be unlawful for

any person· to procure the escape of any prisoner properly committed to the custody of the Attorney General or to any penal or correctional institution, pursuant to the direction of the Attorney General, or to advise, connive at, aid, or assist in such escape, or to conceal any such prisoner after such escape."

■ It is usually sufficient if the charge contained in the indictment follows the language of the statute creating the offense, particularly where the statute defines and describes the offense. The quoted statute sufficiently described and defined the offense so as to apprise one charged with its violation of the nature of the crime. Ackley v. United States (C.C.A.8) 200 F. 217; O'Neill v. United States (C.C.A.8) 19 F.(2d) 322; Stokes v. United States (C.C.A.8) 39 F.(2d) 440.

■ We are of the view that the offense which the defendants are charged with conspiring to commit, was sufficiently described, unless, as urged by defendants, it was impossible for the Attorney General to have the legal custody of Nash, because the indictment charges his prior conviction, and that by the judgment and sentence of such conviction, he "was duly sentenced by said court to imprisonment in the United States Penitentiary at Leavenworth, Kansas for a term of twenty-five years, and was, on the 3rd day of March, 1924, duly committed to the United States Penitentiary at Leavenworth, Kansas, pursuant to and in accordance with said conviction and sentence. * * *"

. Although section 753i, title 18 U.S.C.A., as well as section 753f, title 18 U.S.C.A., were passed in 1930, after the time of Nash's sentence, he was nevertheless in the custody of the Attorney General by virtue of the statutes then existing. The Attorney General was the head of the Department of Justice, R.S. § 346 (5 U.S.C.A. § 291); Ponzi v. Fessenden, 258 U.S. .254, 42 S.Ct. 309, 311, 66 L.Ed. 607, 22 A.L.R. 879, and, until the enactment of section 753, title 18 U.S.C.A., was in charge of prisons and prisoners of the United States. Act June 10, 1896, c, 400, § 1, 29 Stat. 380; Act March 3, 1891, c. 529, §§ 1 and 3, 26 Stat. 839; Act March 3, 1901, c. 853, § 1, 31 Stat. 1185. These acts are carried forward into title· 18 U.S.C.A., as sections· 761, 741, and 792.

In Ponzi v. Fessenden, supra, it is said that the Attorney General "is the hand of the president in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings and in the prosecution of offenses be faithfully executed. * * * The prisons of the United States and the custody. of prisoners under sentence are generally under the supervision and regulation of the Attorney General."

When, therefore, the place of confinement was designated by the court, it in effect committed Nash to the custody of the Attorney General. All those exercising physical custody and restraint over him as a· prisoner were doing so under the supervision and regulation of the Attorney General. The charge that when captured by agents of the United States Bureau of Investigation, he was then properly committed to the custody of the Attorney General, is a warranted conclusion to be drawn from the fact that he had been sentenced to and confined in the United States Penitentiary. The later statutes passed after Nash was sentenced (sections 753f and 753i, title 18 U.S.C.A.) but recognize and continue a status that had already existed. In section 753f, there is a clear and explicit recognition of this fact. It provides that "all persons convicted of an offense against the United States shall be committed, for such terms of imprisonment and to such types of institutions as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences of all such persons shall be served." This express reference to the commitment of the prisoner to the custody of the Attorney General was necessary, not because the prisoner had not theretofore been so committed, but because section 753a provided that the newly created Bureau of Prisons should have charge "of the management and regulation of all Federal penal and correctional institutions and be responsible for the safe-keeping, care, protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." This provision effected a change in the law, as the Attorney General had theretofore been in charge of prisons and of prisoners to the fullest extent and for all purposes. The director of the Bu-

■■■■■■■■■■■■■■■■ **19**

reau of Prisons acts directly under the Attorney General. Section 753g, title 18 U.S.C.A., provides that the transportation of prisoners shall be by such agent or agents. of the Department of Justice as the Attorney General or his authorized representative shall from time to time nominate.

We are of the view that the court properly overruled the demurrer to count 1 of the indictment.

2. Should the court have granted defendants' motions for a directed verdict of not guilty? This inquiry necessitates a consideration of the evidence which is voluminous and somewhat complicated.

Frank Nash escaped from the United States Penitentiary at Leavenworth, Kan., October 19, 1930. He had served only a part of a twenty-five year sentence. The United States Bureau of Investigation had been endeavoring to locate and apprehend him for more than two years. Representatives of that department had succeeded in locating and apprehending two of Nash's associates, and returned them to the Leavenworth Penitentiary. In the early part of June, 1933, an agent of that department located at Oklahoma City made contact with an informant who offered to point out Nash to agents of the department, provided he were paid $500 if Nash should be apprehended. As a result of these negotiations, on June 16, 1933, Nash was captured at the White Front pool hall or cigar store in Hot Springs, Ark., by two special agents of the Department of Justice and the chief of police of McAlester, Okl. Following his arrest he was placed in the automobile in which these officers had driven to Hot Springs. The car bore a California license number, and those present at the time of the arrest reported that Nash had been kidnapped. The officers proceeded with the prisoner toward Little Rock, Ark., but en route they were stopped by certain officers who reported that they had received a telephone message that a man had been kidnapped and was being transported in a Buick car bearing a California license number. The agents explained to these officers that they were special agents of the Department of Justice with an escaped federal prisoner. Passing through Little Rock to the north, they stopped at Conway, Ark., where they telephoned the agent in charge of the Oklahoma office

that Nash had been apprehended. The agent, Ralph H. Colvin, directed them to proceed to Fort Smith, Ark., and there await further directions. They arrived at Fort Smith about 6 p. m., and were then directed by Mr. Colvin to proceed from Fort Smith by train, with Nash, to Leavenworth, Kan. These two agents, Mr. Lackey and Mr. Smith, together with Otto Reed, the chief of police of McAlester, Okl., with Nash in their custody, took a Missouri Pacific train for Kansas City, Mo., due to arrive in Kansas City at 7:15 a. m., June 17th.

On the night of June 16th, Mr. Colvin communicated with Mr. Vetterli, special agent in charge of the Bureau of Investigation at Kansas City, Mo., and arranged through him to have men present to meet this train. Accordingly, on the morning of June 17th, a group of officers consisting of special agents Vetterli and Caffrey, with police officers Hermanson and Grooms of the Kansas City Police Department, were at the Union Station in Kansas City to meet the train. When the train arrived, Smith, Lackey, Reed, and Nash alighted, and with the officers who were present to meet them, walked up the stairs to the station and out through the waiting room. There was no train then leaving for Leavenworth, and they decided to take Nash by automobile. All of these assembled agents and officers proceeded to cross the street, and placed Nash in the back seat of the car, with a special agent on either side of him, but later switched Nash to the front seat of the car, where he was seated on the driver's side of the seat. Although prominently bald, Nash was at the time wearing a toupee, and although he had formerly been smooth shaved, he was at this time wearing a heavy black moustache, and was wearing nose glasses. Smith, Lackey, and Reed got into the rear seat, and agent Caffrey, whose car was being used, was walking around in front of the car, intending to open the door on the driver's side and move Nash to the other side. Hermanson, Grooms, and Vetterli were standing on the right side of the car. Another car was parked a short distance off to the right of them, and over the hood of this car, an individual suddenly appeared with a machine gun at a distance of approximately fifteen feet. "There were two other gangsters with him. The command, 'Up

with them, up, up,' came and then the further words, 'Let them have it,' and the machine gun and other guns opened fire." Officers Hermanson, Grooms, Reed, and the prisoner, Nash, were killed. Agent Caffrey received wounds from which he died later. Agents Vetterli and Lackey were wounded, but recovered. Agent Smith, who was sitting between Vetterli and Lackey in the back seat, was uninjured.

The evidence shows that Verne Miller, alias Verne Mason, alias Verne Moore, was the man who used the machine gun. One of the other parties was identified as Adam Richetti, and the other was identified as Charles Arthur Floyd, alias "Pretty Boy" Floyd, all notorious outlaws.

A recital of the facts and circumstances connected with this atrocious massacre, when considered with other facts and circumstances hereinafter related, bespeaks a concert of design and purpose on the part of the outlaws Miller, Richetti, and Floyd to effect the escape of Nash, the success of which was apparently thwarted by the unobserved switching of Nash from the back seat to the driver's side of the front seat. It remains to consider whether the defendants participated in that common design and purpose. The object of the conspiracy being an unlawful one, it was not necessary that these defendants should have known what means were contemplated to effect that object, and it was not even necessary that the means should have been agreed upon. The criminality of the conspiracy was the unlawful agreement to effect the escape of Nash.

In considering the relation of these defendants, it should be observed that each of them was known under various names. For instance, Galatas was also known as Sheridan and Galadis; Farmer was known as Black, Williams, and Patton; Mulloy was known as Frank B. Mulloy and Fritz Mulloy; Stacci was known as Doc Stacey; Elizabeth Galatas was known as Betty McFadden and Mrs. Glenn Morris; Vivian Mathis, the purported wife of Verne Miller, was also known as Vivian Page and Clara Hays, while Frank Nash also had assumed the name and was known as George W. Miller, and was apparently married to the defendant Frances Nash under that name; he also went by the name of Frank Harrison and R. N. Mills. Farmer had served a term in the penitentiary with Nash, and Mulloy was also an ex-convict.

In reviewing the evidence tending to support the verdict, in addition to the facts already recited, we refer back to the year 1928, when it appears that Mrs. Nash (then Mrs. Luce) was working at the O. P. Inn, near Chicago, Ill., and she continued to work there until the latter part of 1931. She was there employed by the defendant Stacci, and there met Verne Miller as Stacci's guest. She became intimately acquainted with Verne Miller and with the defendant Vivian Mathis, who lived with Miller as his wife, first meeting her at the O. P. Inn. She also met Frank Nash at this place. She seems to have lived with him as his wife, and later, in 1933, at Hot Springs, Ark., was formally married to him under the name of Miller. In January, 1932, Nash and wife (they were then living together as husband and wife) returned to Chicago. Vivian Mathis met them, and, by invitation, they went to live at the Verne Miller apartment in Oak Park, so that Mr. and Mrs. Nash, Verne Miller, and Vivian Mathis were all living at this place. Prior thereto, all four of them had been together in New York for four weeks. Before her formal marriage to Nash, Mrs. Nash had been in Hot Springs some five weeks and became acquainted with defendant Galatas and his wife. They were invited to the Galatas home, had meals and drank beer with them. During the time they were in Hot Springs they became acquainted with the defendant Herbert Farmer and his wife. The Farmers lived with Nash and wife at Hot Springs for a month. Farmer was a gambler, and Galatas operated a gambling establishment. In April, 1933, Verne Miller was in Hot Springs and was with Nash and wife, Galatas, and Farmer and wife. They all met at the White Front. While in Hot Springs, Nash was a frequent visitor at the White Front and saw Galatas daily. In the latter part of May, 1933, Nash and wife went on a trip, returning to Hot Springs late at night on June 14th. They drove to the home of Galatas, but Nash left his wife at a tourist camp, where she remained until after his capture on June 16th.

After Nash was taken into custody, Galatas went to see Mrs. Nash, and said to her: "My God, they have just picked up your husband. Pack up your clothes

and come with me. Come to my house. I am afraid you will be picked up too." Soon after the departure of the agents with Nash, Galatas learned that Nash was not kidnapped, and he so told Mrs. Nash. Apparently Mrs. Nash had not known the identity of Nash until she learned it from Galatas subsequent to his capture. Returning to the Galatas home, Galatas said: "I wonder who put the finger on Nash. I would be the first one to turn a shovel on him." Mrs. Nash decided to call her friend Mrs. Farmer at Joplin. She had learned from Galatas that Nash was being taken to Joplin. In the telephone call to Mrs. Farmer she asked if she might come to their home because "Jelly" (nickname for Nash) had been arrested. Mrs. Farmer replied: "Why yes, any of Jelly's friends are welcome in my home." Galatas hired an airplane at his own expense to convey himself, Mrs. Nash, and her daughter to Joplin. Farmer met them on their arrival at Joplin, and drove them to his home. Galatas and Farmer went down town for the avowed purpose of seeing if they could find out if Nash had been brought to Joplin, saying that they would do what they could to get Jelly back to his wife; but when they returned, they reported that he was not in town.

Before leaving Hot Springs, Galatas had told his wife that if she wanted to get in touch with him to call him at Esther Farmer's home, and shortly after they arrived at the Farmer home, Mrs. Galatas called Galatas on the telephone and advised him that Nash was not to be brought to Joplin, but that the federal men were taking him from Fort Smith, Ark., by train "on in." Before Galatas and Mrs. Nash left Hot Springs, he told her that Nash had told him if anything ever happened to him, he was to call Carey 65 and get in touch with Doc. Mrs. Nash replied that it was useless to call Carey 65, but that he could get in touch with Doc (nickname for Stacci) at the O. P. Inn, or at his home in Maywood. Mrs. Nash called the O. P. Inn. She was excited and asked Galatas what she should say. He said: "Tell them Jelly has been arrested and that you are going to Joplin, and for him, for Doc, to get in touch with Verne and that you—that they, should get in touch with you over at Esther Farmer's." At the Farmer home Mrs. Nash said: "I wonder why I don't hear from Doc or Verne." It was decided that she should call Verne Miller. Mrs. Farmer produced a telephone number which she said was Verne Miller's number in Kansas City. She then called Miller and told him that Mrs. Nash was there with her baby and Galatas, and about the arrest of Nash. Mrs. Nash also talked with Miller, and Miller tried to console her. She told Miller that Nash had been picked up by three men and hustled out of Hot Springs and that they were headed for Joplin and that was why she was there, and she wanted to know what she was to do, or where she should go. She told Miller that Galatas was there, and Miller said: "Let me talk to Dick." Galatas then took the phone and said: "This is Dick. I just got word they were taking Frank on in from Fort Smith, Arkansas." He gave Miller the train number, and finished this conversation by saying: "Can I be of any assistance to you?" This call was made in the evening at 10:15, to Verne Miller's residence in Kansas City, Mo. A little after midnight Verne Miller called the Farmer residence and again talked to Mrs. Nash. He told her he was down at the station and asked her where she was going, what she was going to do. In the course of the evening Mrs. Farmer told Mrs. Nash, in the presence of Farmer and Galatas, that Nash was an escaped prisoner.

When Mrs. Nash called the O. P. Inn in Chicago, she did not talk to Stacci, but the message was delivered to him on a golf course. He was playing golf with "Machine Gun" Jack McGurn. Stacci was well acquainted with defendant Mulloy, who lived in Kansas City, and also with Miller. He had gone to Kansas City to play golf with Miller, and had dined with Vivian Mathis, Miller, and Mulloy. Mulloy was well acquainted with Verne Miller, Miller and Vivian Mathis having lived in his house for two or three weeks. In May, 1933, Mulloy had telegraphed $500 to Nash under the name of George W. Miller, at the request of Vivian Mathis. Stacci, after receiving the message on June 16th, that Nash had been arrested and to get in touch with Verne Miller and the Farmers, called Mulloy at Kansas City. He told the porter at the Horseshoe Club, with which Mulloy was connected, that he was the man who used to come to their place and drink gin bucks with Verne Miller, and that he wanted to get in touch

with Miller. Stacci talked directly to Mulloy and told him he was trying to get in touch with Verne Miller, and he wished Mulloy would put him in touch with Miller; that he had talked to a woman who said Miller was not at his home. Mulloy attempted to get in touch with Miller, and talked with Vivian Mathis, and she said she would give Miller the message that he should call Stacci. Later that day, Mulloy saw Miller when he came from the golf course, and asked if he had received the message he gave Vivian Mathis, and Miller said he had already talked with Stacci. There was independent evidence that Miller called Stacci in Chicago. After the shooting, Mulloy removed Miller's personal belongings to Mulloy's home.

Farmer, as has been observed, had known Nash for a long time and had served a term with him in the Oklahoma Penitentiary. After Nash escaped from the Federal Penitentiary at Leavenworth, he spent the first week at the Farmer home near Joplin, but after publicity appeared in the newspapers about his escape, Farmer told him he had better leave. Mrs. Farmer was heard to say over the telephone on June 16th: "They got by us here at Joplin. We watched from every angle but they got by us." Mrs. Nash, after the killing, went to Chicago. She saw Stacci, and he said to her: "You don't know anything." When interviewed by an agent of the Department of Justice, Mr. and Mrs. Farmer first denied that Galatas, Mrs. Nash, or her child had been at their home June 16th, and also denied that any telephone calls were made from their home that evening. On June 17th, Mrs. Farmer told Mrs. Nash that she had a message from Verne Miller, saying: "You are to go home and get out of this town." Galatas and his wife left Hot Springs June 18, 1933, and went to St. Louis. They rented an apartment there, and later bought an automobile under the name of Lee. Then they went to California, thence to New Orleans, and then returned to California. In March, 1934, they again went to Louisiana, where they remained until apprehended. During all this time they used the name Lee. On June 18th, Farmer told his wife that he had better disappear for a few days owing to his association with Nash.

After Nash was apprehended by the federal agents, and this fact was known

to the defendants, it is clear that there was concerted action among them which had to do with the custody of Nash. They all knew that Nash was an escaped convict, and that he was being returned to the penitentiary to complete service of a sentence that had been pronounced against him. There is nothing in the circumstances to indicate that it was the purpose or thought of any of these defendants to resort to legal proceedings for the purpose of securing the release of Nash, and it is equally clear that there was a general purpose and design to effect his release from the federal officers.

In Davis v. United States (C.C.A.6) 107 F. 753, 755, it is said: "If the evidence shows a detail of facts and circumstances in which the alleged conspirators are involved, separately or collectively, and which are clearly referable to a preconcert of the actors, and there is a moral probability that they would not have occurred as they did without such preconcert, that is sufficient if it satisfies the jury of the conspiracy beyond a reasonable doubt."

Conspiracy is rarely susceptible of direct and positive proof, but it may be proven by circumstantial evidence. Goode v. United States (C.C.A.8) 58 F.(2d) 105, 107; Cooper v. United States (C.C.A.8) 9 F.(2d) 216, 224; Smith v. United States (C.C.A.8) 157 F. 721, 728; Feigenbutz v. United States (C.C.A.8) 65 F.(2d) 122, 124.

In Goode v. United States, supra, it is said: "The agreement need not be in any particular form, but it is sufficient that the minds of the parties met understandingly. A mutual implied understanding is sufficient so far as the combination or confederacy is concerned; and, in fact, the agreement is generally a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. It is not necessary to prove that the defendants actually agreed in terms to adopt the unlawful purpose and to pursue it by common means. A conspiracy is rarely susceptible of proof by direct evidence, but must be proved by circumstantial evidence. It may be deduced from the conduct of the parties and the attending circumstances."

In Cooper v. United States, supra, it is said, concerning the offense of con-

spiracy: "It is practically always established by circumstantial evidence, and this method in no sense amounts to the building of one presumption upon another."

In Smith v. United States, supra, it is said: "The effects and results of a conspiracy can be observed and proved, but rarely can one get a glimpse or make proof of the secret conferences which inaugurate it. For these manifest reasons proof of a criminal combination to do an unlawful act can rarely be made except by light reflected from its consequences or results."

In Feigenbutz v. United States, supra, this court, speaking through Judge Van Valkenburgh, said: "Conspiracy is an offense which can ordinarily be established only by a great number of apparently disconnected circumstances. Necessarily the existence of the conspiracy in most cases can be made to appear only inferentially from the acts of the parties committed in furtherance thereof."

■ If the evidence is as consistent with the innocence of the defendants as with their guilt, of course, no conviction can properly be had. Langer v. United States (C.C.A.8) 76 F.(2d) 817. This court is not charged with the duty of considering conflicts in the evidence, credibility of witnesses, the plausibility of explanations offered by defendants, or the weight of the evidence. Its sole function in this regard is to determine whether there is substantial evidence to support the verdict. Cravens v. United States (C.C.A.8) 62 F.(2d) 261; Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362; Smith v. United States (C.C.A.8) 50 F.(2d) 46; Webster v. United States (C.C.A.8) 59 F.(2d) 583. The jury having found the defendants guilty, that view of the evidence and the inferences reasonably to be drawn therefrom must be taken which is most favorable to the government. Zottarelli v. United States (C.C.A.6) 20 F.(2d) 795. Overt acts of the parties may properly be considered with other evidence and attending circumstances, in determining whether a conspiracy exists, and where the overt acts are of the character which are usually, if not necessarily, done pursuant to a previous scheme and plan, proof of the acts has a tendency to show such pre-existing conspiracy, so that when proven they may be considered as evidence of the conspiracy charged. Safarik

v. United States (C.C.A.8) 62 F.(2d) 892; Rand v. United States (C.C.A.8) 77 F.(2d) 52.

In McDonnell v. United States (C.C.A.1) 19 F.(2d) 801, 803, speaking of the sufficiency of the evidence to connect a defendant with a conspiracy, the court approved an instruction which said: "It is enough if a man, understanding that there is a crowd banded together to break the law, knowing in a general way what the purposes of the crowd are in that respect, becomes a member of it and acts with them to a greater or lesser extent."

In the instant case, the evidence, including the attending circumstances, all points to the irresistible conclusion that the defendants knew the purpose of all this activity with reference to the custody and apprehension of Nash. These activities could have had but one purpose and object—the escape of the prisoner, Frank Nash. These defendants and the three outlaws who committed the actual murders were all intimately related. The character of the participants, their methods of life, and their actions subsequent to the recapture of Nash, all tend to show that their entering into the conspiracy charged was not improbable. Vause v. United States (C.C.A.2) 53 F.(2d) 346; Hood v. United States (C.C.A.8) 23 F.(2d) 472; Minner v. United States (C.C.A.10) 57 F.(2d) 506.

■ It is earnestly urged that the evidence against Mulloy is insufficient, and it must be admitted that the evidence against him is not as strong and convincing as the evidence against the other defendants, but, after all, the weight of the evidence was a matter for the consideration of the jury. Mulloy not only telephoned Stacci, communicated with Miller, and delivered messages concerning the subject of this conspiracy, but it is observed that following the shooting which snuffed out the lives of five human beings, removed Miller's personal effects from the house he was occupying to his own home. The jury may properly have inferred from this act that it was done to conceal and to prevent detection. Statements, admissions, or narratives by one conspirator after the conspiracy is ended are not competent against other conspirators, but such evidence is admissible against the conspirator who makes them. Heard v. United States

(C.C.A.8) 255 F. 829. Evidence that Mulloy attempted to assist the concealment of Miller, one of the chief conspirators, was therefore proper for consideration as establishing his guilty connection with the conspiracy. Where a conspiracy is established, but slight evidence connecting a defendant therewith may still be substantial, and if so, sufficient. Tomplain v. United States (C.C.A.5) 42 F.(2d) 202.

We conclude that there was substantial evidence tending to prove the defendants guilty beyond a reasonable doubt, and hence, the court properly denied the motions for a directed verdict.

3. Exceptions are urged to certain instructions of the trial court, but the exceptions now urged were not presented nor preserved in the lower court and cannot, therefore, be raised here. Mansfield v. United States (C.C.A.8) 76 F.(2d) 224; McAdams v. United States (C.C.A.8) 74 F.(2d) 37; Hansen v. United States (C.C.A.8) 61 F.(2d) 514; McCutchan v. United States (C.C.A.8) 70 F.(2d) 658; Busch v. United States (C.C.A.8) 52 F.(2d) 79.

Complaint is also made of the charge because the court, by way of illustration, used a hypothetical case. The court made it clear that the hypothetical case was used as an example only of what constituted conspiracy, and the jury could not have misunderstood the purpose of the illustration used.

Objections are now urged to the charge with reference to the question of the prisoner being in the custody of the Attorney General, but our decision as to the sufficiency of the indictment disposes of this question adversely to the contention of defendants.

The trial judge, in one part of his charge, told the jury that in his opinion one of the witnesses had told the truth, but he clearly and distinctly advised the jury that the credibility of the witness was for them to decide, and that his opinion was not binding upon them. This comment did not, we think, exceed the power of the trial judge to comment on the evidence, provided the jury be advised, as they were here, that the decision on all issues of fact is left to them. Hartzell v. United States (C.C.A.8) 72 F.(2d) 569.

It is also urged that the court erred in refusing certain requested instructions, but the court covered the requests fully in the charge given, and gave defendants the benefit of the applicable law and hence, there was no error in refusing the requested instructions.

It is urged in appellants' brief, but was not pressed on oral argument, that the venue was improperly laid in the Western District of Missouri. Venue is sustained either by proof that the conspiracy or an overt act occurred in the district. Sloan v. United States (C.C.A.8) 31 F.(2d) 902. The telephone calls to and from Kansas City, which is within the district where the indictment was returned, were overt acts committed therein. Hartzell v. United States, supra.

The record indicates that this case was tried by the lower court with great care and marked impartiality. The defendants were ably defended and were afforded a fair trial, and we are of the view that no prejudicial error was committed.

The judgments and sentences appealed from are therefore affirmed.