## RYAN v. UNITED STATES.
### No. 11159.

Circuit Court of Appeals, Eighth Circuit.
Nov. 15, 1938.

Rehearing Denied Dec. 5, 1938.

Clyde Taylor and Price Wickersham, both of Kansas City, Mo., for appellant.

Sam C. Blair, Asst. U. S. Atty., of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., and Randall Wilson, Richard K. Phelps, and Thomas A. Costolow, Asst. U. S. Attys., all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

Appellant, with eight others, was indicted in an indictment which charged a conspiracy to injure and oppress specified citizens of the United States in the exercise of rights secured to them under the Constitution and laws of the United States, in violation of Section 19 of the Criminal Code, Sec. 51, Title 18 U.S.C.A.

The indictment contained two counts, but as Count 1 was dismissed by the Government, it will be passed without further reference. Count 2 charges a conspiracy to injure Republican voters of the 15th precinct of the 12th ward in Kansas City, Missouri, who should vote for the Republican candidate for Congress in the 1936 election. The right charged to have been impaired was the right to vote and to have their votes counted for the Republican candidate. The method adopted to impair that right was the false certification and return that certain ballots which had in fact been cast for the Republican candidate for Congress were cast for the Democratic candidate.

The indictment was returned on April 1, 1937. Frances S. Ryan, the appellant here, Ellis Buck, Sam Brenner, Viola Doss, Louise Davis, Frances M. Eaton, Ernest Williams, Herman Supofsky and Elva O'Byrne were named defendants. The case was continued as to Frances M. Eaton. Elva O'Byrne entered a plea of guilty; Louise Davis and Viola Doss entered pleas of nolo contendere. The other defendants entered pleas of not guilty, and on trial were found guilty. This appeal is taken by Frances Ryan alone. She seeks reversal on substantially the following grounds: (1) The evidence is insufficient to sustain the verdict; (2) the trial judge erred in proceeding after an affidavit of bias and prejudice was filed against him; (3) the trial court erred in charging the jury as to the penalty that might be imposed; (4) the trial court erred in refusing instructions requested by appellant.

The jury having found appellant guilty, we must accept that view of the evidence which is most favorable to the Government. Walker v. United States, 8 Cir., 93 F.2d 383; Galatas v. United States, 8 Cir., 80 F.2d 15; Marx v. United States, 8 Cir., 86 F.2d 245.

In view of the challenge to the sufficiency of the evidence, it will be necessary to consider it in some detail. The election was held November 3, 1936. Ellis Buck, Sam Brenner, Viola Doss, Louise Davis, Frances M. Eaton and Ruth Tucker constituted the election board in the 15th precinct of the 12th ward. Brenner and Buck were Democratic judges of election. Viola Doss and Louise Davis were acting as Republican judges of election. Ernest Williams was a Democratic precinct captain. Herman Supofsky was a Democratic worker, while Frances M. Eaton and Ruth Tucker were clerks of election.

The polling place was located at a tire shop at 4007 East 15th Street, Kansas City, Missouri. The polls opened at 6 o'clock A. M., and closed at 7 o'clock P. M. At the opening of the polls, Brenner told Buck to work on the original register. When Viola Doss arrived at the polling place, a Mr. Butler, who had been regularly appointed and commissioned as a Republican judge and who was working on one of the registers, yielded his place to her and went to work as a Republican precinct captain at some other precinct. During the day there were certain irregularities at the polling place which are not here important, but the following occurrences should be noted: About 3 o'clock in the afternoon, Brenner and Supofsky, who had worked together at registration in this same precinct in September, asked the owner of the tire shop if he had a room upstairs which they might use for a while. Having secured permission so to do, they went upstairs to the kitchen, where they sat down at a table with some "rather large books before them." They remained in that room approximately an hour. A correct count of all votes cast at this precinct showed that the Democratic candidate for Congress received 462 votes; while the Republican candidate received 136 votes. The certificates to the poll books and tally sheets, however, showed that the Democratic candidate received 565 votes, and the Republican candidate only 35 votes. These certificates were signed by the judges and clerks of election. Although the polls did not close until 7 o'clock, these certificates were signed before 4 o'clock in the afternoon.

When the polls closed, the doors and windows were locked. It then became the duty of the judges and clerks of election to count the votes and to certify that the count was correct in all respects. Revised Statutes Missouri, Secs. 10616, 10620 and 10633, Mo.St.Ann. §§ 10616, 10620, 10633,

pp. 3902, 3905, 3912. A paper was put up at the windows so as to shut out vision from the outside, and Williams, the precinct captain, who also functioned as a Democratic challenger and watcher, took the ballot box, without any apparent right, and emptied the ballots out on the table and directed the others to straighten them out and put them in piles. They were then "scooted down" to the end of the table to Brenner, where, without being counted, they were put in a bag, which was then sealed. Williams then took the bag, with the tally books and poll books, which had been falsely certified, and delivered them to the Board of Election Commissioners. The false count, falsely certified, thus became the official count of the Board of Election Commissioners, and, under the law, was the final count.

Evidence was received as against defendants Buck, Brenner, Tucker, Williams and Supofsky of incriminating statements made by them, which, however, are not relied upon by the Government as against Appellant. An expert witness testified that 101 of the 441 straight Democratic ballots were spurious and fictitious; that straight Republican ballots had been changed to appear as Democratic ballots. There is no direct evidence as to who changed these ballots.

Appellant makes no contention that there was not substantial evidence to show that the conduct of the precinct officials at the voting place on election day was in violation of Section 19 of the Criminal Code, 18 U.S.C.A. § 51. Counsel, in their brief, say: "Appellant Ryan does not claim that there was not substantial evidence to show that the conduct of the precinct officials at the voting place on election day was in violation of Section 19." Again, in reply brief, this declaration is reiterated in the following words: "Appellant admitted and now admits that there was substantial evidence to show that precinct officials were guilty." Her contention is that there was no substantial evidence connecting her with the conspiracy. We, therefore, direct our attention to the evidence bearing upon her connection with the confessed conspiracy.

Appellant had been active in politics since the 1928 election. Beginning as a precinct captain, she became ward boss of the 12th ward in 1934. She was a member of the so-called Pendergast faction of the Democratic party and had charge of the 12th ward for it, and handled the headquarters for that faction throughout the year, except Sundays. She selected and gave instructions to the Democratic precinct captains. She was elected Democratic committeewoman in August, 1936. As committeewoman, she recommended Democratic judges and clerks of election for the ensuing year for the 12th ward, and she named twenty-eight judges and fourteen clerks of election. Matt Devoe assisted her at the headquarters called the "12th Ward Democratic Club." She was also superintendent of the Jackson County Parental School, to which position she was appointed by the Democratic organization.

Elva O'Byrne had been Republican Committeewoman in the 12th ward since 1930. Lester L. Aulgur was the Republican committeeman. Aulgur and O'Byrne had a meeting with appellant and Matt Devoe about the middle of September, before registration. Before going to that meeting, O'Byrne called appellant and asked her if there had been an agreement made the night before with Aulgur, Devoe, and others, to which appellant answered that there had been. O'Byrne asked if she was in on the meeting, to which appellant answered that she did not want to talk to her over the phone. Aulgur asked O'Byrne to call appellant to find out where the meeting would be held and suggested that she find out what the agreement was. Appellant said she could not attend the proposed meeting that night because she would have to go to see Jimmy Pendergast to see if the agreement was all right. The next night, Aulgur, with defendant O'Byrne, went to the Jackson County Parental School and there met appellant and Devoe in appellant's office. O'Byrne said she would like to know what the agreement was about. Devoe said, "We will give you $100.00 for the registration and we are going to give Lester L. Aulgur all the small contracts." O'Byrne said, "Well, I want my vote count, aren't we going to get our votes, Republican votes?" Appellant answered, "Yes, you will get every one of them, but you must remember, Mrs. O'Byrne, that you haven't the working organization there that we have and therefore you will not get near as many votes as we do." Defendant O'Byrne said, "And I am not in for padding the boxes." Appellant said, " * * * the boxes will not be padded." Defendant O'Byrne made some argument as to whether she was to

get her votes, when Devoe jumped up, snapped his fingers, and said, "Make it short and snappy. Business is business, and we must get out of here." Appellant gave Aulgur and O'Byrne $100 apiece. She remarked that she had had a time to get the $100 and that she had to make two trips to Jimmy Pendergast to get the money.

During the registration, appellant showed an interest in the manner in which the registration was being conducted in the 12th ward. She objected to various Republican judges of election and demanded that they be removed by Mrs. O'Byrne, and threatened that they would be beaten up if not removed. Four of these judges were removed.

About a week before the election, Mrs. Doss, who, except for a single instance in 1938, always voted a Democratic ticket, and who had been employed as a Democratic worker by appellant, asked her for employment in the 1936 election. At that time appellant said she had no work for her, but about 5 o'clock the evening before election, she called Mrs. Doss and asked her to come to the 12th ward headquarters. Arriving there, Mrs. Ryan told her she was to work as a Republican judge, and told her, "It was all right to go see Mrs. O'Byrne." She sent Mrs. Doss to Republican Hall on 15th Street to see Mrs. O'Byrne, but was recalled by Mrs. Ryan to the Democratic headquarters, where Mrs. Ryan told her she would find Mrs. O'Byrne at a beauty parlor, giving her the location. There she met Mrs. O'Byrne. Neither had ever seen or talked with the other before. Mrs. O'Byrne inquired, "Are you the lady Mrs. Ryan sent from the Democratic headquarters over here for your commission?" Mrs. Doss in reply, said she was. Mrs. Ryan directed Mrs. O'Byrne to give Mrs. Doss credentials, and Mrs. O'Byrne gave her "a commission to act as Republican judge in the 15th precinct of the 12th ward." The day before election, Mrs. Ryan telephoned Mrs. O'Byrne at Republican headquarters, and told her she wanted to put on Mrs. Viola Doss, and that Mrs. O'Byrne "would have to take out Claude Butler, commissioned Republican judge of the 15th precinct," saying that if she did not do so, he would be "beat up and thrown out." Mrs. Ryan assured Mrs. O'Byrne that Viola Doss was all right and that she was a Republican.

On Saturday preceding the election, Mrs. Ryan told Mrs. O'Byrne that she wanted Amelia Johnson, Republican judge from the 17th precinct, Mrs. Maude Weeks of the 3rd precinct, and Mrs. Perinotte of the 3rd precinct, and Mrs. Ellis of the 25th precinct, removed, saying, "I want those judges taken out and if you don't take them out they will be beat up and thrown out." She said they (she and Devoe) had the men to do it. Again, before election day, Mrs. Ryan talked to Mrs. O'Byrne and Aulgur about removing these same judges, and they were removed. The night before election, Mrs. Ryan met Mrs. O'Byrne at the Republican headquarters downstairs. Mrs. Ryan gave her $40, saying, "Here is the money that Mr. Aulgur wanted for taking out the judges. He wanted $50.00 but I will not give but $40.-00." Aulgur and Mrs. O'Byrne divided this money equally.

About 8 p.m. the night before election, Mrs. O'Byrne had a meeting of Republican workers. Most of the judges and clerks and Republican precinct captains were present. The meeting was in ward Republican headquarters. Mrs. Ryan at that time called Mrs. O'Byrne on the telephone. Mrs. O'Byrne and Aulgur were present. As to this conversation, Mrs. O'Byrne testified that Mrs. Ryan said to her, "that she heard that I was giving orders to my judges and clerks to see that the ballot boxes were not stuffed, and to see that my Republican votes were counted * * and said she didn't want me to do that, and she says, 'You do as you are told.' "

There was some discrepancy and inconsistency in the testimony of the witness as to this conversation, and it is insisted that the testimony is lacking in probative force. But the testimony of the Government must be viewed in the light most favorable to it. The testimony above quoted is the last testimony given by the witness, and we assume that the jury accepted it as the correct version of the conversation. The mere fact that a witness' testimony may to some extent be self-contradictory does not prevent its constituting substantial evidence. Craig v. United States, 9 Cir., 81 F.2d 816. The credibility of the witness and the weight to be given his testimony are, of course, matters to be determined by the jury. New Amsterdam Casualty Co. v. Iowa State Bank, 8 Cir., 1 F.2d 196; Yellow Cab Co. v. Kelly, 3 Cir., 62 F.2d 1032.

Appellant came to the voting place twice on election day. On each occasion she parked her car across the street and remained in it. Defendant Williams went across the street to the car each time and conversed with her. Mrs. Ryan and Mrs. O'Byrne had known each other for at least five years. They were representing rival political parties in similar capacity, and we may assume that it was the duty of each to induce as many people as she properly could to vote for her respective party. There would seem, in the usual course and honest conduct of the duties of each to have been no occasion for political conferences nor association, nor would it seem that they legitimately had any political interests in common.

In December, 1936, Viola Doss visited appellant at her home and told her she was worried; that she saw "trouble coming out in the paper." Appellant said she too was worried, and told Viola Doss not to remember and not to mention her name and if anybody asked her if she knew Mrs. O'Byrne to say that she did not know her. On January 11, 1937, after appellant had learned that there was an investigation of election frauds in Kansas City, a Special Agent of the Federal Bureau of Investigation asked her whether she had visited any polling place, including the 15th precinct, 12th ward, on election day, and whether she had given instructions to defendant Williams that he should return in his precinct any certain number of votes, or that the Republicans and Democrats should obtain a certain percentage of the votes. She denied that she had done so.

After being informed in January, 1937, that the Federal Grand Jury had returned an indictment against her, defendant Doss saw appellant and told her she was worried. Appellant said not to worry; that she would be taken care of; that they had good counsel; that she thought it would never come to trial. Viola Doss told her that she had told the Government agents that appellant had sent her to Mrs. O'Byrne, to which appellant replied that Viola Doss had got her into it and if anybody came to see her (appellant) and asked her, she was going to tell them she did not even know her. She told Viola Doss it would not cost her anything to get out of this trouble; that they had good counsel and not to worry. A Special Agent later in January visited appellant and questioned her about Viola Doss, whereupon appellant declared that she did not know any Viola Doss. After the investigation, appellant told O'Byrne to keep still and tell her Republican workers all to keep still on this investigation, and that everyone would be taken care of with free legal advice and bail, and that she (O'Byrne) would have to take the rap for Viola Doss because if she should tell that Viola Doss came from Democratic headquarters to her, that would prove conspiracy.

Mrs. O'Byrne had another conversation with appellant, in which appellant said that "Mr. Jimmy Pendergast had told them to give the Republicans out of the 12th ward 2500 Republican votes but she and Matt Devoe had only given between 1300 and 1400, and she said that when she made the report to Mr. Jimmy Pendergast that he made the remark like he did not like it about her not giving 2500, but she said that she could tell by his actions that he was more than pleased with the victory."

A conspiracy must usually be proven, if at all, by circumstantial evidence. Galatas v. United States, supra. If there is a concert of purpose, it is not necessary that there be a participation by each conspirator in every detail of its execution. Galatas v. United States, supra; Rand v. United States, 8 Cir., 77 F.2d 52; Feigenbutz v. United States, 8 Cir., 65 F.2d 122; Goode v. United States, 8 Cir., 58 F.2d 105; Luteran v. United States, 8 Cir., 93 F.2d 395; McDonald v. United States, 8 Cir., 89 F.2d 128; Smith v. United States, 8 Cir., 157 F. 721.

It is urged by appellant that without the statements and admissions made by her, there was not sufficient or substantial evidence to prove the corpus delicti. It is her contention that these statements and admissions can be given no consideration whatever so far as proof of the corpus delicti is concerned. It is true that the corpus delicti can not be established by such admissions or concessions alone. They must be corroborated by independent proof. However, such independent proof need not be strong enough in itself to establish the corpus delicti. Oldstein v. United States, 10 Cir., 99 F.2d 305, filed Oct. 14, 1938. As said by us in Tingle v. United States, 8 Cir., 38 F.2d 573, 575,

"But in conspiracy cases, the unlawful combination, confederacy, and agreement between two or more persons, that is, the

conspiracy itself, is the gist of the action, and is the corpus delicti charged."

In the instant case, as we have already observed, it is admitted by counsel for appellant that the conspiracy alleged in the indictment was established by substantial evidence. That, we take it, established the corpus delicti in this case. The identity of the accused is not an element of the corpus delicti, and while extra judicial admissions or confessions of an accused are not of themselves sufficient to establish the corpus delicti, yet they may be considered in connection with other independent evidence in determining whether the corpus delicti has been proven and such evidence may in itself be sufficient to prove the identity of the accused or his connection with the crime, and where the evidence is circumstantial, the same proof which tends to prove the corpus delicti may also tend to prove the guilt of the accused.

A consideration of this testimony warranted the jury, we think, in believing that this appellant, through bribery and intimidation, organized, directed, and controlled the conspiracy charged. She was connected with the conspiracy from its inception and was its guiding spirit. She reorganized the staff of election officers so as to make sure that her plans to defraud certain citizens of their right to vote and to have their votes counted as cast would not be opposed. She directed and superintended the procedure in a most masterful and efficient manner. She not only participated in the conspiracy but she was the archconspirator and dominated, guided and controlled the election officers in this precinct. We conclude that there was no error in denying her motion for a directed verdict.

On April 13, 1937, following the return of the indictment, appellant filed an affidavit of personal bias and prejudice against Judge Otis. On May 19, 1937, it was overruled. Subsequently, on February 26, 1938, she filed a second affidavit, and this was likewise overruled. In her reply brief she has disclaimed all claim of error in the action of the court in overruling the second affidavit, so that we shall confine our attention to the affidavit first filed. This affidavit alleges that the trial judge issued an order providing for the summoning of a jury and the exclusion from its membership of jurors residing in Jackson County, Missouri, which order recited that great publicity had been given in Kansas City and Jackson County to election cases already tried, and that there had been widespread discussion, by reason of which it would be extremely difficult to obtain from Kansas City and Jackson County impartial jurors, certainly without causing to be summoned a very large panel of jurors and so unnecessarily incurring a large expense. The order recited further that almost without exception all defendants named in the pending cases were residents of Kansas City and Jackson County, and all the offenses charged to have been committed in the several indictments pending, almost without exception were charged to have been committed in Kansas City and Jackson County. In explaining the order excluding jurors residing in Jackson County, the trial judge stated that the testimony in two cases which already had been tried before him, when read by the court, would "reveal a more general condition than the precise spot depicted," and that "it reveals such a display of terrorism on election day, on registration day, and on other days, as only one who wishes to be a superficial observer would think could be confined to a single precinct." The judge then proceeded to recite other facts disclosed by the testimony and to suggest that the court could see by reading the testimony that "such sinister forces are at work in Kansas City as that to call jurors from Kansas City would be to invite mistrials and the breaking down of the administration of the law." It was also stated that the testimony established "the deliberate alteration in one precinct of the ballots of more than 100 citizens," and "the deliberate stuffing of the ballot box," and that in another precinct it showed that "not a single ballot was counted." The court said that "the testimony reveals the domination in this precinct of judges and clerks of election by one of the defendants," and "that in another precinct one of the convicted defendants threatened with death another of the defendants if she did not consent that the ballots be not counted." The court also said, "Other evidence revealed that on election day, three unidentified individuals so terrified one election official so that finally she was driven from her post of duty." In conclusion the court said, "Jurors, as well as election judges, however honest and well-disposed by nature, easily may be robbed of their independence and impartiality, by threats, covert and open, so easily convey-

ed and conveyed in so many ways to those called for jury service." The judge said that the situation in Kansas City was a matter of common knowledge and that "it is not necessary, however, here, to refer especially to these matters of common knowledge," and then said that the testimony at the trial of the two cases would itself furnish an adequate picture for this court.

The statute requires that a judge, to be disqualified, must have a personal bias or prejudice against the party or in favor of an opposite party. Title 28 U.S.C.A. § 25. Judicial rulings can not ordinarily be made the basis of a charge of bias or prejudice. If there is error in such rulings, it may be corrected on appeal. Cuddy v. Otis, 8 Cir., 33 F.2d 577; Wilkes v. United States, 9 Cir., 80 F.2d 285. The propriety of the order excluding residents and citizens from Kansas City and Jackson County in selecting the petit jury panel was sustained by us in Walker v. United States, 8 Cir., 93 F.2d 383. The making of this order can not in itself be said to show any personal bias or prejudice against the appellant.

Great reliance is placed upon the decision of Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481. In that case, the defendants were of German extraction. In the affidavit filed it was alleged that Judge Landis had said, among other things [page 231], "If anybody has said anything worse about the Germans than I have I would like to know it so I can use it. * * * One must have a very judicial mind, indeed, not to be prejudiced against the German-Americans in this country. Their hearts are reeking with disloyalty. This defendant is the kind of a man that spreads this kind of propaganda, and it has been spread until it has affected practically all the Germans in this country. * * * You are the same kind of a man that comes over to this country from Germany to get away from the Kaiser and war. You have become a citizen of this country and lived here as such, and now when this country is at war with Germany you seek to undermine the country which gave you protection. You are of the same mind that practically all the German-Americans are in this country, and you call yourselves German-Americans. Your hearts are reeking with disloyalty. I know a safeblower, he is a friend of mine, who is making a good soldier in France. He was a bank robber for nine years, that was his business in peace time, and now he is a good soldier, and as between him and this defendant, I prefer the safeblower." These statements were made against a class of which the defendant was a member. They evinced pronounced personal prejudice against that class, showing a personal prejudice against the defendant.

In the instant case, there is nothing in the remarks of the trial judge indicating any personal bias or prejudice against any person who might come before him for trial in connection with these election fraud cases. His statements were made in the course of judicial proceedings prior to an appeal to this court. The common knowledge of a widespread condition in Kansas City would not necessarily include any particular precinct. As said in Craven v. United States, 1 Cir., 22 F.2d 605, 608, "The statute never contemplated crippling our courts by disqualifying a judge, solely on the basis of a bias (or state of mind, [Berger v. United States], 255 U.S. [22] 42, 41 S.Ct. [230], 236, 65 L.Ed. 481) against wrongdoers, civil or criminal, acquired from evidence presented in the course of judicial proceedings before him." An opinion based upon evidence can not be considered a personal prejudice. There was nothing in these judicial utterances indicating that the judge entertained or expressed any opinion that this appellant was guilty.

The affidavit also sets forth excerpts from an opinion of the judge which overrules substantially identical affidavits in a group of election cases of which this case, however, was not one. It is reported as United States v. Buck, D.C., 18 F.Supp. 827. In that opinion, the court made use of the expressions "sinister forces are at work in Kansas City [Missouri]," and "sinister forces were and are lurking in the background." [page 830.] These expressions were all made in the discharge of judicial duty, and they do not indicate any personal prejudice. Other expressions are set out in the affidavit as appearing in judicial opinions written by Judge Otis, none of which, when the opinions are read, indicate any personal reflection against any of the parties, and certainly indicate no personal bias or prejudice against appellant. There was no error in overruling the affidavit of prejudice.

As has been observed, there was no severance in this case, and the defendants who stood trial were all tried together. They were, however, represented by separate counsel. Counsel for various defendants other than the appellant, in their arguments dwelt upon the subject of the penalty or punishment to which his client on conviction might be subjected. Counsel representing one defendant read the statute under which the defendants were being prosecuted. One said, "There must certainly be some evidence before you men before you would send a woman to the penitentiary." Another said, "I further submit to you that the only thing this man is guilty of is negligence, but you can not send him to the penitentiary for negligence, and I would not want to be a party to it if I were any one of you. * * * I want you to consider these things. I want you to weigh them with sincerity because, so help me, I am pleading with you with all the sincerity in my heart and soul. Weigh these things that will either put convict stripes on the backs of men and women or turn them out on the street free men and women to go back to their families. Are you going to convict a man or woman or men and women because they were negligent and did not know?" Still another said, "A defendant can be sent to the penitentiary for as high as ten years, with a fine of $5,000.00, and I say to you if he is convicted, no matter what the sentence, the court may assess, he loses his right to hold office, his right to citizenship, and I say to you that Supofsky, with that mother out there waiting for him, has more at stake than almost any one." Another counsel referred to the prosecution as an attempt "to railroad Ernest Williams into the penitentiary. * * * My interest here is that of Ernie Williams. I am interested, of course, in seeing that justice is done as to every defendant in this case, but I merely represent Ernie Williams. (This was followed by reading the statute, including that portion of the statute prescribing the penalty.) * * * Maybe those who will close for the United States when the defense lawyers are through here will try to tell you some reason why Ernest Williams ought to be faced with up to a $5,000.00 fine and up to ten years in a Federal Penitentiary."

No reference to penalty had been made by counsel making the opening argument for the Government. Neither was any mention made of the subject of punishment by counsel representing appellant. In the closing argument for the Government, counsel simply said that the matter of fixing the punishment was a duty which devolved upon the court and not upon the jury. The trial court, at the close of his instructions, said:

"One of the attorneys for the defendants said that he would not like to see any woman sent to the penitentiary. He was talking for that one of the defendants who served as a clerk at the election in question, Mrs. Tucker. As counsel have said to you, the punishment runs from $1.00 to ten years and $5,000. Since that matter has been referred to, I will say to you gentlemen that if the defendant represented by counsel who made that statement to the jury is found guilty by this jury, she will not be sent to the penitentiary.

"Another of counsel said that it might be urged upon you that the minimum punishment was only $1.00 and that the purpose of urging that upon you might be to lead you to believe that if some one of the defendants were found guilty, he or she would escape with a punishment of a dollar or a day in jail. Counsel said to you that that was not to be expected and he was right. While the maximum punishment provided by this statute is ten years' imprisonment and $5,000, since there has been so much discussion of the matter of punishment, I think I am justified in saying to you that in the thirteen years I have served in this office, the maximum punishment of the law never has been imposed on anybody, except in one case in St. Joseph where a man was tried before me five times in succession. On the fifth trial I gave him the maximum.

"I think that I am, and everybody will bear me out when I say, that the punishments I impose are lenient and governed by the circumstances of the case. Not only will the maximum punishment not be imposed in this case, but half of the maximum will not be imposed, nor a third of the maximum in the event anyone is found guilty beyond a reasonable doubt.

"But, on the other hand, as counsel said, let no one believe that any such punishment as a $1.00 fine will be imposed. If this jury find that any man or woman is guilty of having conspired with another to rob an American citizen of his vote, his punishment will not be a trifling, ridiculous punishment, but one commensurate

with the crime which, in my judgment, is one of the most serious crimes that can be committed. I will not impose any punishment, gentlemen of the jury, upon the theory that conspiring to steal the votes of American citizens is a trifling thing. Now, I have made that reference to the matter of punishment because it has been made necessary by the argument of counsel."

 Appellant excepted to this part of the instruction. It is argued by appellant that this charge was bartering with the jury for a verdict of guilty, and that so far as appellant was concerned, the charge had not been invited nor provoked by any argument made by her counsel. In the trial of a criminal case in many of the states, the judge acts in the capacity of an umpire, without authority to discuss, explain or analyze the evidence before the jury, and without authority to express any opinion as to the guilt or innocence of the accused. In the national courts, however, the trial judge is more than an umpire. He may discuss, explain, and analyze the testimony to the jury, and may express an opinion as to the guilt or innocence of the accused, so long as he makes it clear that the jury is not bound by his opinion, but that the guilt or innocence of the accused must ultimately be determined by them. Decisions of the state courts, therefore, with reference to the conduct of a trial judge in his instructions to the jury, are not persuasive.

 It is clear that so far as the defendants other than the appellant are concerned, they are not in position to complain because the arguments presented in their behalf invited, if, indeed, they did not make necessary some explanation or statement by the court with reference to the punishment. Calcara v. United States, 8 Cir., 53 F.2d 767; London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325; Chicago & N. W. Ry. Co. v. Kelly, 8 Cir., 84 F.2d 569. The defendants were all tried together. At least some of the arguments with reference to penalty purport to have been made on behalf of all defendants. Counsel for appellant did not disclaim the benefit of any such argument. Such an argument having already been presented to the jury, it would, of course, have been a waste of time and energy to repeat it, and counsel for appellant refrained from doing so. What the court said with reference to the punishment was

not, we think, a more persuasive invitation to convict the defendants than would a statement by the court that he thought the defendants guilty. The court very clearly warned the jury against assuming that the conviction of a defendant would necessarily result in a light punishment. The court emphatically said that if the jury should find either of the defendants, whether man or woman, guilty, his punishment would not be trifling, but one commensurate with the crime, which the court said, "in my judgment is one of the most serious crimes that can be committed."

 What is here said on this subject must be understood to be confined to the peculiar facts and situation here presented. The practice of permitting a detailed discussion of the extent of punishment in the argument and of indulging in a discussion in the instructions of the punishment that may be anticipated in the event of conviction, is not to be commended; but, we think, in view of the arguments presented on behalf of all defendants, the instruction now complained of was provoked and rendered appropriate, if not necessary.

 While the appellant excepted to this part of the instruction, we think this was not sufficient to enable her to have the question here reviewed. The instruction being, under the circumstances, proper as to the other defendants, it was incumbent upon her to request an instruction calling the jury's attention to the fact that her counsel had made no argument concerning the matter of punishment; that she disclaimed any benefit of such argument, and that as to her, neither possible severity or leniency of sentence was to be considered in any way. Review in this court may be had on any ruling upon procedure, only where there appears an objection and a ruling, and the objection, ruling and exception must be embodied in the bill of exceptions. McCutchan v. United States, 8 Cir., 70 F.2d 658. The exceptions to this instruction were properly overruled, in view of the arguments of counsel for the other defendants. Since the instruction itself was proper, even as to appellant, who made no disclaimer of the benefits of the arguments of other counsel, and which were applied generally, the overruling of the exceptions presented no reversible error. Error could be made affirmatively to appear only if the appellant had requested a charge to the effect above suggested.

874

It is mildly suggested in brief of counsel that the court erred in refusing certain requested instructions. This assignment, though not briefed nor argued by counsel on either side, has been waived. But we have examined the requested instructions and are of the view that they were properly refused by the court.

The judgment appealed from is therefore affirmed.